No. 5371.

.23  477
34  385!

## G. S. FELDER *v.* THE STATE.

1. MURDER—EVIDENCE—CHARGE OF THE COURT.—On this, a trial for murder, the State was permitted to prove by a witness that, when he arrived at the place of the homicide, some member of the crowd there congregated pointed to the defendant, whom the witness had just met two doors distant from the place of the homicide, and exclaimed: "There is the man who did the shooting." The defendant at that time was walking with another man. The rule under which such proof could be admitted may be stated as follows: To entitle the State to introduce in evidence the declaration of a bystander, it must be clearly shown that the defendant understood himself to be accused of the criminal act committed; and, further, the circumstances must have been such as to require of him a response. Even when the requirements of this rule are complied with, and the evidence has been properly admitted, it devolves upon the trial court to instruct the jury as to the legal function of the evidence so admitted, and that it can not be relied upon by the State to establish the defendant's guilt of the main fact in issue, *i. e.*, that he committed the criminal act. *Held* that, under the rule stated, the admission of the declaration of the bystander in this case was error. See the opinion *in extenso* on the question.

2. SAME—DYING DECLARATIONS—IMPEACHING TESTIMONY.—It is competent for a defendant on trial for murder to impeach the dying declarations of the deceased inculpating him as the slayer, by proving statements made by the deceased, contradictory of his dying declarations; and, in excluding such impeaching proof in this case, the trial court erred. See the opinion on the question.

APPEAL from the District Court of Travis. Tried below before the Hon. A. S. Walker.

The appellant in this case was convicted in the second degree for the murder of Sam Persons, a colored man, in the city of Austin, Travis county, Texas, on the twenty-fifth day of November, 1885. A term of twenty-five years in the penitentiary was the penalty assessed.

Charles Alexander was the first witness for the State. He testified that he met the defendant, for the first time, on the night of November 25, 1885, in the "Gold Room Saloon," on Congress avenue, in the city of Austin, which saloon was kept b⸗ D. H. L. Hunter. Defendant came into that saloon on that night with

Jim Glover. A party, consisting of the witness, defendant, George Murray, M. Smith, Gib. Stovall, Charles Farrow, W. Stotts, and a stranger to the witness, got to throwing dice. Sam Persons stepped into the saloon and walked ·back to the ice or beer chest, and witness and defendant walked to the front end of the bar counter. Witness, who had but fifty cents, challenged defendant to throw dice. Defendant produced three or four dollars, which he offered to bet, but as witness did not have that amount of money, they did not throw the dice. While the witness and defendant were standing at the bar, Persons passed through the room, going towards the front door, which was hung on hinges to open either way. Defendant produced a pistol from his overcoat pocket and said : "I'll just shoot that negro for fun," and fired, just as Persons extended his hand to push the door open. Persons fell in the doorway, having been shot from behind, the ball entering between the shoulder and back. When the shot was fired, the witness and the other parties then in the room, viz., Murray, Smith, Stovall, Farrow, Stotts, and the unknown man, fled to the back room through the billiard room. The defendant passed out at the front door, and must have stepped over Persons's body, as it lay angling before the door. No trouble of a serious nature had transpired prior to the shooting, though Persons had said something which offended the defendant. When defendant's anger became manifest, Persons remarked that he did not want any trouble with that white man and would leave, and he was leaving when shot. The witness saw no other person than the defendant with a pistol.

On his cross examination, the witness, after some hesitation, testified that, two or three days after the shooting, he told M. Smith, the bar tender on duty that night, that he, witness, knew nothing about the shooting, but he explained that he was not then under oath, and did not want to appear as a witness in this case. He had no recollection of telling Smith that he was "so d—d drunk on that night that he did not know how the shooting happened." In answer to the question if he was not so drunk on that night that Mr. Hunter, on his arrival at the saloon, had to put him out, the witness said that he remembered that Hunter put him out of the saloon, but that Dave Hunter was such a crank he would put anybody out of his saloon. The witness and Jerry Brown were the only parties who testified on the inquest over Persons's body. The defendant and Persons had

some words which witness did not hear. They did not appear angry, but afterwards defendant said that he wanted no trouble. No quarrel or fight took place, but Persons, as he was leaving the room, slightly "brushed" defendant's elbow. Defendant drew his pistol from his overcoat pocket, remarked, "I'll just shoot that negro for fun," and fired as above stated. In the talk with Smith, two or three days after the shooting, witness asked Smith what occurred at the time of the shooting, but did not tell Smith that he wanted to know what to swear. He wanted to ascertain what Smith knew about the shooting, and told Smith that he, witness, knew nothing about it. On his re-examination, the witness said, referring to the conversation with Smith a day or two after the shooting, that Smith asked him if he knew how the shooting happened, and that he replied: "Of course I do, but I want to know what you saw." If witness then told Smith that he did not know what happened on the night of the shooting, he told Smith a falsehood.

George Murray, colored, testified that he was working as porter in the Gold Room saloon, on the night and at the time that Persons was killed. Chas. Farrow, W. Stotts, Charles Alexander, M. Smith, Gib. Stovall, a man called Doctor Felder, an unknown man and witness were present when the shot was fired. Doctor Felder and Jim Glover came into the bar room together, but Glover left before the shooting. Persons came into the saloon, and ate some fish and drank a glass of beer. He then started out and was shot by some one in the room just as he was extending his right hand to push the front door open. The witness, who was then engaged at the sink, washing glasses, did not see who fired the shot, but he saw all the parties in the room, except Doctor Felder, at that time, and knew that none of the parties he saw fired the shot. Witness started to go to Persons, but met the crowd going into the billiard room, and turned and went with them. He then saw the man called Doctor Felder step over Person's prostrate body and go out at the front door, holding a small pistol in his hand. Witness could not positively identify the defendant as the man called Doctor Felder. Immediately after the shot was fired, some one in the room exclaimed, "Doctor Felder shot him."

Cross examined, the witness stated that before the shooting he saw Persons standing with and talking to Farrow and Stotts at the rear end of the bar. Leaving that place, Persons walked towards the door, passed and touched Doctor Felder at the front

end of the counter, and had reached the door with his right hand when the shot was fired. Witness heard no words pass between deceased and Felder on that night. Everything up to that time had passed off pleasantly. Doctor Bennett reached Persons soon after the shooting, and had him taken to his mother's house. The crowd had been drinking, but none of them appeared drunk. Alexander had been drinking, but witness did not see him stagger. If Alexander was put out of the saloon on that night in a drunken condition, witness did not know it. Mr. Hunter was telephoned for, and came immediately after the shooting. Witness had a conversation with him on his arrival, but did not tell him that he, witness, was in the back yard with a bucket of slop when the shot was fired, and saw nothing that transpired. He told Hunter that he did not see the shot fired, but did not tell him what he did see.

Jerry Brown was the next witness for the State. He testified that he was standing at the corner of Congress avenue and Pecan street, about half a block south of the Gold Room saloon, when the shot was fired. He had then been at that point about twenty minutes, having gone there from the Gold Room saloon, where he had been watching a Dutchman perform sleight of hand tricks. Witness saw the defendant in the saloon. The sleight of hand man was still performing when the witness left the saloon. About the time that witness got to the corner of Pecan street and the Avenue, Sam Persons crossed Pecan street from Hirshfeld's corner, south of the block in which the Gold Room saloon stands. As he passed, witness said: "Sam, I thought you was in bed." He replied: "I have been, but I got hungry." Witness then observed that he went into Simon's restaurant, the building adjoining the Gold Room on the south. In a very short time he came out of the restaurant with something in his hand, and went into the Gold Room. The witness was then standing on the corner, in conversation with H. G. Madison and Lewis Morris, two negro policemen. Within twenty minutes the witness heard a shot fired in the Gold Room. Witness, Madison and Morris ran immediately to the Gold Room, witness in advance. When he reached the corner of Kopperl's book store, the second building below the Gold Room, the witness met Doctor Felder, with one hand in his overcoat pocket, walking leisurely down the street. About the time that witness and the two policemen reached the Gold Room, Mr. Farrow, who was then standing on the curbing in front of the Gold Room,

pointing towards the defendant, then walking leisurely down the street, said: "That is the man who did the shooting." Madison and Morris then ran towards defendant, Madison ahead. Just before Madison reached him, the defendant turned suddenly and fired his pistol at Madison.

Cross examined, the witness said that he had never seen the defendant prior to that night, and saw him for the first time since then on this trial. He knew, however, that defendant was the man he met at Kopperl's corner, and who was pointed out by Farrow as the man who did the shooting, and who shot at Madison. Witness saw Persons immediately after he was shot, lying on the saloon floor, just inside the door. He talked to Persons, but Persons said nothing to him about who shot him. Persons lingered from his wound and died five or six months after it was inflicted. Felder went into the Iron Front saloon, the third building below the Gold Room, after he shot at Madison.

Policeman Lewis Morris, colored, testified, for the State, that when the shot was fired he was standing at the corner of Congress avenue and Pecan street with Policeman Madison and somebody else. The parties immediately ran to the Gold Room, Madison in advance of witness. When witness reached the Gold Room he observed one man standing in the door. About that time two men, one of them being defendant, who had his left hand to his face or head, and his right hand in his overcoat pocket, passed out of the Gold Room and walked down the street. The man with the defendant was calling, "police." About that time the man standing in the door, pointing towards the two men going down the street, said: "That's the man who did the the shooting." About that time the man with defendant jumped off the sidewalk and fled, and had not been seen since by the witness. When the men in the door pointed out the defendant as the man who fired the shot, witness and Madison, the latter in advance, ran up to defendant, who turned suddenly and fired at Madison, powder burning his face. Defendant then turned into the Iron Front saloon, and witness ran down Pecan street and then into the alley to the rear door of the said saloon, where he found night watchman Wilkie. Defendant soon appeared and snapped his pistol at Wilkie. Defendant was then arrested and disarmed by witness, and, with the assistance of Madison, was taken to the city jail and turned over to night clerk Boyce. Witness examined defendant's pistol when he

reached the city jail, and found it to be a small pocket five shooter with three empty chambers, two of which had been recently discharged. Witness had no recollection of seeing Jerry Brown before getting to the Gold Room. As the defendant passed out of the Gold Room he said: "I'm shot!" or "I'm hurt!" Witness was satisfied that the defendant was the man he arrested after the shooting, but would not so testify unqualifiedly. He had never seen defendant before. H. G. Madison testified substantially as did this witness.

Alex Wilkie testified, for the State, that he was standing at the cigar stand in the Iron Front saloon when the shot was fired. He immediately went to the door and saw one or two men go into the Iron Front saloon. About that time some one said: "There goes the man who shot." Witness then ran around to the rear door of the said saloon, and defendant soon appeared. He put a pistol to the witness's face and snapped it. Witness took the pistol out of his hand and struck him over the head with it, and then arrested defendant, and turned him over to Policeman Madison. He gave the defendant's pistol to Policeman Morris. Witness would not swear absolutely that defendant was the man arrested by him.

R. A. Boyce, night watch at the police station, testified, for the State, that defendant was turned over to him by Policemen Madison and Morris on the night of November 25, 1885. On the next day he was delivered to the sheriff.

Deputy Sheriffs Hornsby and Johnson testified that the defendant was the man turned over to the sheriff by the authorities of the police headquarters on the morning of November 26, 1885.

Doctors T. J. Bennett, T. D. Wooten and J. F. McKinley, witnesses for the State, concurred in declaring that the death of Sam Persons resulted from causes superinduced by the wound. The ball obtained a lodgment against the spinal cord in such a manner as to render a surgical operation for its removal an experiment of too much danger to be attempted. Doctor Bennett stated that he reached Persons about twenty or thirty minutes after the wound was inflicted, and while he was still lying on the Gold Room floor.

On his cross examination this witness stated that, while there, Persons said that he did not know the man who shot him.

This testimony, on the motion of the district attorney, was withdrawn from the jury. The defense then asked the witness the following questions: "Did Persons, at any time, or imme-

diately after you reached him, while lying upon the Gold Room floor, before removal to the hack (to be taken home), say who shot him, or how it happened?" "Did Persons, at any time before his death, during your visits to him, make any statements as to who shot him or how it happened, differing from the statement made while in the Gold Room, if he made any statement while at that place?" Which questions, together with the answers thereto, were, upon the State's objection, disallowed by the court, and the defense reserved exceptions.

Lee Ann Persons, the sister of deceased, was the next witness for the State. She testified that her brother died on the twenty-sixth day of April following the twenty-fifth day of November, on which he was wounded. About a week before his death he made a statement to witness as to how he received his wound. He was conscious of approaching death. He had no hope of recovery, and expressed his conviction that he would die. He was of sane mind, and made this statement voluntarily, and not in response to questions propounded by any one. Speaking of the shooting, he said: "I had finished my work and had said good bye, and started home. Coming out of the saloon, I passed a man they called Doctor Felder, standing at the bar, who had a pistol in his hand, and who said, as I passed, 'I'll shoot that negro for fun.' I went on and had my right hand on the door, and he shot and I fell. He stepped out over me with his pistol in his hand, and I said to him, 'Don't shoot me any more; you have given me enough.' I had never seen Doctor Felder before, had never spoken to him, and did not know him. The man said, with an oath, 'D—n you, I'll shoot that negro,' as I passed by the man standing by the counter. The man was called Doctor Felder. I had my hand on the door when shot, and I held on when I fell, when the man passed out, stepping over me."

The State closed.

A. O. Watson was the first witness for the defense. He testified that he was an architect, and made the diagram of the Gold Room used in evidence. A man standing at the sink where the glasses were washed (referred to in George Murray's testimony) could not see into the saloon, except that part behind the counter or bar and the front end of the bar. He could not see the door of entrance, nor people nor objects in front of the bar, without leaning forward to change the range of vision. Going from the saloon behind the bar into the sink room, one would pass through a door way having bracket work overhead. No curtain now

hangs from that bracket work. The bracket was about seven and a quarter feet above the floor. The plank partition wall between the saloon room and the billiard room, extends to and sixteen and a half inches beyond the inner edge of the counter or bar. The wall could not be seen through. The front and rear doors of the saloon are swinging doors opening either way. The doorway below the bracket work was sixteen inches wide. On his cross examination the witness said: "If a man was near the door he could have seen over the room. If he was in the door he could have seen over the room. What he could have seen would depend upon his position and line of vision."

D. H. L. Hunter, the proprietor of the Gold Room saloon and billiard hall, was the next witness. He testified that the Watson diagram of the interior of the Gold Room, as it was at the time of this trial, was correct. It represented the Gold Room as it was on the night of November 25, 1885, except that two damask curtains then hung in the doorway behind the counter, between the saloon and the sink room. These curtains were fastened to the sides of the doorway on either side, to admit passage without touching them with the hands. A person standing at the sink where the glasses were washed, could not see further than half way down the counter behind the bar. He could not see parties on the outside of the bar, nor could he see the door through which parties entered or left the saloon. When, in answer to a telephone message on the night of November 25, witness reached his saloon, he found George Murray there, and Sam Persons, wounded and lying on the floor. Witness asked Murray how the shooting occurred, and he answered that he was in the yard with a bucket of slops when the shot was fired, and did not see it and knew nothing about it. Witness also saw Charles Alexander, who was beastly drunk—so drunk that he was finally put out of the house. Witness asked Alexander how the shooting occurred. Upon objection by the State the witness was not permitted to state Alexander's reply. Witness left his saloon about nine o'clock on that night. When he last saw Sam Persons, a few minutes before leaving, he, Persons, was drunk.

Cross examined, the witness testified that after he got to the saloon, some one, but not Persons, told him that Doctor Felder shot Sam Persons. Smith, whom witness had recently seen, told witness that nobody was in the saloon when the shooting occurred.

Officers Johnson and Dornwell testified, for the defense, that they knew Jerry Brown's reputation for truth and veracity, and that it was very bad.

Doctor T. J. Bennett was introduced by the defense, and was asked if, when he got to Sam Persons, then lying on the floor in the Gold Room, Persons told him who shot him and how the shooting came about. This question and the answer thereto were excluded by the court; to which the defense objected because the said evidence was admissible as part of the *res gestæ;* because, the State having proved Persons's dying declarations, the evidence referring to the same subject matter was necessary to the full understanding of the same, and because it was competent thus to contradict the dying declarations.

The motion for new trial raised the questions discussed in the opinion.

*Rector, Moore & Thomson,* filed an able brief and argument for appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. I. Upon the trial below, the State, over objection thereto by appellant, was permitted to introduce the following testimony: "When you reached the place where the shooting occurred, did any one say who had done the shooting?" "Yes; some one in the crowd pointed out Doctor Felder, and said: ' There is the man who did the shooting.' I had just met Doctor Felder walking leisurely down the street." Other testimony shows that the point at which appellant was met "was about the corner of Kopperl's book store," a building situated two doors from that in which the homicide was committed, and at the front of which the latter exclamation was made.

To the admission of this testimony a bill of exceptions was reserved, the exception basing itself upon the proposition that the evidence elicited was hearsay, and not *res gestæ.*

"The question is," says Mr. Wharton, "is the evidence offered that of the event speaking through participants, or that of observers speaking about the event? In the first case, what was thus said can be introduced without calling those who said it; in the second case, they must be called." (Whart. Crim. Ev., sec. 262.) To the same effect is the following, from Mr. Bishop's treatise on Criminal Procedure: "But, while the declarations

and outcries of persons neither on trial nor injured by the defendant's acts may be admissible, to be so such persons must be otherwise connected with the transaction than as mere lookers-on, or the defendant must have been listening, and perhaps under circumstances requiring from him some response." (1 Bish. Crim. Proc., sec. 1087.) Hearsay testimony, as a rule, is admissible to prove no fact which is in its nature susceptible of proof by witnesses testifying of their own knowledge. (Bradshaw v. The State, 10 Bush (Ky.), 576; Holt v. The State, 9 Texas Ct. App., 572; Means v. The State, 10 Id., 16; Shelton v. The State, 11 Id., 36; Roscoe's Crim. Ev., 22, 23.)

The circumstances of the Kentucky case of Bradshaw v. The State, supra, perhaps present as strong reasons for admitting the declarations of bystanders not connected with the transaction as can easily be conceived. In that case the theory of the prosecution was that defendant had shot deceased with a pistol, while on the platform of a railway coach, and thrown the body therefrom, the train at that time being in motion. In support of this theory persons inside the coach and immediately in rear of the platform were permitted to testify to the following exclamations made by persons standing on the platform, and in the immediate presence of the actors: "Bradshaw has shot him!" "Bradshaw has pushed him off!" "Bradshaw has killed him!"

It will be noted that these exclamations were made upon the instant, and presumably in the hearing of the accused. There was in them certainly enough of spontaneity to make them of the *res gestæ;* but they were held inadmissible upon the single ground that the persons making them were in no way connected with the main fact. Cases may and do arise in which the exclamations of bystanders, unconnected with the transaction, are admissible; of which the following furnishes an illustration: A and B are engaged in a combat. C, a bystander, cries out, "B is trying to cut A with a knife!" In the further progress of the difficulty B receives injuries at the hands of A. This exclamation is admissible, for the obvious reason that it illustrates A's intent, it being presumed that the apprehension of danger thereby created influenced his action, and this whether the information was in point of fact true or false.

Let us, however, reverse the conditions: Suppose after this exclamation, B, the party whom the exclamation represents as attempting to use the knife, inflicts an injury upon A, and is put upon trial. Here the exclamation is not admissible to illus-

trate the subsequent act, since this is better illustrated by a physical fact—the act itself—to the commission of which the witness must be called.

If this conclusion be not correct, and it be held that the exclamation was admissible, either to identify the accused, to show flight, or for any other purpose, it will scarcely be denied that the accused must have heard it, and have heard it under circumstances calling for a response, before he could be charged by silence. The burden of showing that the exclamation was heard will, in such case, rest upon the State; and in a majority of cases this can only be done by circumstances, such as contiguity and other opportunities for hearing. But, whether shown by proof or by circumstances, the proof that the exclamation was heard by the accused must be the predicate for the introduction of the exclamation itself.

Admitting, however, that the exclamation was heard by appellant, it becomes a question whether the circumstances required of him a response. According to the testimony, another person accompanied appellant at the time the declaration was made. Was this declaration or exclamation a sufficient identification of the appellant to call upon him for a response? Did the declaration individualize him as even the one of the two persons against whom the charge was made?

But it is insisted by the assistant attorney general that the appellant is shown to have understood himself to be the person charged, by the fact that when he was being arrested he shot at one of the policemen and snapped his pistol at another. Let us, for the argument, concede that he was being arrested for the shooting of Persons, the deceased, does it follow that this knowledge came to him from the declarations and acts of bystanders? May he not have first learned this from his being arrested? The arrest, and the acts and declarations of appellant while being arrested, are admissible; but this would not render competent the declarations of bystanders that appellant was the man who did the shooting. The statement of facts informs us that "some one in the crowd pointed out defendant, and said, 'There is the man who did the shooting.'"

Lewis Morris testified that one or two men passed into the Iron Front saloon, that they were almost running, and somebody said "there goes the man that shot Persons," pointing out appellant. The above is the substance of the testimony on this point. It will be noticed that there is no evidence that appellant saw

the party point him out.   He may have heard the remark, but there is no evidence that it was he that was individualized; this was not brought home to him, and he may have understood it to apply to the other man who was near him.

As above stated, to entitle the State to introduce the declaration of a bystander, it must be clearly shown that the defendant understood himself to be accused, and the circumstances must be such as to require from him a response.   Now, the failure in this case is at the threshold, for it is not shown that appellant, at the time of the remark, knew that he was the man referred to, and hence the declaration can not be used for the purpose of charging him with that concurrence of circumstances which would call upon him for a response.

Again, if the declarations of a bystander could, under any circumstances, be used for such purpose, they could not be used for the purpose of proving that the accused did the act charged. This being the case, great circumspection should be used in admitting such declarations, even in cases in which there is strong testimony to show that the defendant knew himself to be charged, and the circumstances are such as to call for a response. Because it is a fact that, if admitted, the jury will use for any and all purposes.   This devolves upon the court the duty of giving to the jury clear and explicit instructions in confining it to the purposes for which it was allowed. They should be told that those declarations by themselves can not be used to show that the accused committed the act charged.   We are of the opinion that the declarations under discussion were not, under the circumstances, admissible for any purpose.

II.   The State, having introduced in evidence the dying declarations of deceased, in which the homicide was charged upon appellant, the testimony of the surgeon who saw deceased immediately after he was shot, and who attended him during the period of four or five months that elapsed before his death, was offered to show that deceased declared to him, within twenty or thirty minutes after the shooting, that he did not know who shot him, and that he had made the same declaration on one or two occasions thereafter.   On objection by the State this testimony was ruled out, to which exception was taken.

Dying declarations derive their admissibility as evidence from the necessity of the case.   They are generally made to friends of the deceased, and under circumstances where the physical conditions and surroundings of the declarant are such that cross

examination is unattainable.  Made under a sense of nearly
impending death, the awful solemnity of the occasion stamps
them with the verity which attends statements made under the
sanction of an oath.  But the allowance of them is a jealously
guarded concession to the ends of human justice.  That this is
so is evidenced by the requirements as to predicate for their in-
troduction, and also by the limitation upon their admissibility
to the identity of the perpetrator and the circumstances of the
crime.  The oath may be dispensed with; but no circumstances
of extremity can compensate the want of a cross examination.
They are themselves hearsay testimony, and, as has been said,
their admissibility springs out of the necessity of the case.
But, after admitting them, it would be a perversion of all right
reasoning to deny to an accused a like relaxation of the rule,
the occasion for it being produced by a coincident and coexten-
sive necessity.  If the State may invoke a departure from the
ordinary rules of evidence, upon the ground of necessity, would
it not be a hardship to deny the same to the accused, when the
necessity has been put upon him by the concession made to the
State?

" Statements by the defendant," says Mr. Bishop, "contradic-
tory of dying declarations, and contradictions in the latter, may
be shown to detract from their weight with the jury." (1 Bish.
Crim. Proc., 1209.)  The same doctrine is asserted in a long
line of adjudicated cases. (McPherson v. The State, 9 Yerg.,
279; Moore v. The State, 12 Ala., 764; People v. Lawrence, 21
Cal., 368.)

In delivering the opinion in the latter case, Field, C. J., said:
" The rule is general that the credit of a witness may be im-
peached by proof that he made statements contrary to what he
has testified.  There is, it is true, a condition to the rule, with
reference to verbal statements, that the attention of the witness
must be previously called to the particular occasion and circum-
stances under which the supposed contradictory statements were
made, in order to give him an opportunity of making any expla-
nation of the matter which he may have.  But this preliminary
condition, it is clear, can not be complied with when dying dec-
larations are offered in evidence, except in very rare cases.
Such declarations are generally made to the physician of friends
of the deceased, in the absence of the party against whom they
are offered, who, of course, has no opportunity of cross exami-
nation, or of directing the attention of the deceased to any al-

leged contradictory statements made by him.   *   *   *   There would be no justice, therefore, in any rule which would deprive the accused of the right to impeach the credit of the deceased by proof of his having made contradictory statements as to the homicide and its cause."

The precise question here involved is one of first impression with the courts of last resort of this State.   In Sutton v. The State (2 Texas Ct. App., 342), this court held statements contradictory of dying declarations introduced to be, under the circumstances of that case, inadmissible.   In that case the dying declarations were introduced by the State, but subsequently—and before the contradictory statements were offered—withdrawn. The point of insistance was that, though withdrawn, the declarations necessarily influenced the minds of the jury, and it was for that reason urged that the contradictory statements should be admitted to counteract that influence.   These statements being admissible for the single purpose of contradicting the dying declarations, the withdrawal of the latter left nothing to be contradicted, and the contradictory statements stood as naked hearsay, with no reason grounded in necessity to exempt them from the ordinary rule.   The reasoning of that decision is not inharmonious with the conclusion here reached.   Neither from citations to authorities furnished by the State, nor from our own researches, have we been able to find a precedent for excluding the evidence of statements made by the deceased contradictory of his dying declarations, save in one case in the 20 Ohio Reports.

We are of opinion that the exclusion of the contradictory statements in this case was error, and that there was also error in admitting the declarations and acts pointing out appellant as the perpetrator of the homicide.

*Reversed and remanded.*