WM. WILLIFORD v. THE STATE.

*No. 1358.   Decided November 11th, 1896.*

### 1.  Murder—Party Attacking Testimony of His Own Witness.

Our statute, Code Crim. Proc.. Art. 795, give a party the right to attack the testimony of his own witness, when injurious to his cause, in any other manner except, by proof of bad character. And, on a trial for murder, where the defense was self-defense, and a State's witness, on cross-examination, testified that, before the shot was fired, she heard defendant say, "Stand back." Held: This evidence was important and hurtful to the State, and the prosecution was entitled to lay a predicate, by another witness, for the impeachment of the said witness by proof of contradictory statements.

### 2.  Same—As to Putting all Witnesses on the Stand.

There is no rule of law to compel the State to call to the stand to testify every witness who may have been near and knew of any circumstances connected with the killing. Following, Kidwell v. State, 35 Tex. Crim. Rep., 264.

**3. Defendant as a Witness—Impeachment of by Proof of Other Crimes.**

A defendant who testifies as a witness in his own behalf, cannot, on cross-examination for the purpose of affecting his credibility, be asked as to offenses committed by him which do not impute moral turpitude (as, for instance, assault and battery). Following, Brittain v. State, ante p. 406.

**4. Murder—Evidence as to Motive.**

On a trial for murder, while it was competent to prove that defendant's mother had hired deceased instead of her son to attend to her business, which angered the son and occasioned ill feelings between the parties, it was not competent to ask defendant, if he had not spent his part of his father's estate, and was so worthless and drunken that his mother could not get him to attend to her business.

**5. Defendant as a Witness—Cross-Examination and Contradiction of.**

On a trial for murder, where the homicide did not, in any manner, involve the wife of defendant, it was not competent, on his cross-examination as a witness, to attempt to prove by him why his wife had left him, nor to put his mother upon the stand to contradict him as to this matter: and, failing to do so, much less was it competent to call another witness to impeach the mother in this regard.

**6. Recalling State's Witness to Lay Predicate for Impeachment.**

A State's witness who has not testified to any fact injurious to the State, cannot be recalled for the purpose of laying a predicate to impeach said witness.

**7. Acts and Declarations in Presence of Accused—Silence as Evidence.**

On a trial for murder, it is competent to prove, as original evidence, that a party charged the accused with having killed deceased without provocation, and that he stood mute.

**8. Examination of State's Witness—Improper Testimony by Way of Impeachment.**

Where the prosecution, on the examination of its own witness, asks the witness, if defendant did not make a certain declaration to her as to his intention to kill deceased, which she denies or which she says she does not remember, her answer is an end of the matter, and it is not within the power of the State to show, by other witnesses that she, the witness, had so stated to others, and thus get hearsay and incompetent testimony before the jury.

**9. Same—Charge of the Court Limiting and Restricting Incompetent Evidence.**

Where incompetent evidence, such as that stated in Paragraph 8, has been permitted to be introduced, the charge of the court, expunging it entirely, could not relieve the case from the injury which such improper evidence engendered.

**10. Murder—Evidence—Reputation of Deceased.**

On a trial for murder, where it was in evidence that defendant, with a view to the protection of his niece, had objected to his mother's hiring deceased on account of his reputation for getting intimate with young ladies and then slandering them. Held: It was permissible for the prosecution to prove that such was not the reputation of deceased.

**11. Same—Charge—Self-defense.**

On a trial for murder, where the evidence was that when defendant accosted deceased, in a quiet manner, about a matter which they had previously quarreled about, and deceased arose, ran his hand into his pocket, and advanced rapidly towards defendant, who immediately shot and killed him. Held: A charge upon self-defense would be a proper one, which instructed the jury, if they believed the deceased first attacked defendant, or if it reasonably so appeared to defendant, and defendant reasonably believed that his life was in danger or his person in danger of serious bodily injury from such attack, and he then drew his pistol and shot and killed the deceased, it would be in self-defense.

APPEAL from the Criminal District Court of Dallas. Tried below before Hon. CHARLES F. CLINT.

Appeal from a conviction for murder in the second degree; penalty, twenty-five years' imprisonment in the penitentiary.

The indictment charged appellant with the murder of one John Baker, in Dallas County, on the 21st of December, 1894.

The following concise statement of the case is taken from the brief of counsel for appellant, and is substantially correct:

The defendant, William Williford, was about thirty years of age, and while he did not pursue farming as a vocation, he lived most of the time on his mother's farm, near Garland, in Dallas County. His mother was a widow, and was raising three or four grandchildren; among them was a girl, Annie Hughes, fourteen years of age. John Baker lived in the vicinity. His brother, Jim Baker, had married a daughter of Mrs. Williford's, but Mrs. Baker was dead. Mrs. Williford had hired John Baker to work on her farm for the year 1895, and he had moved to her house and was staying there until the time of his service should begin. It seems that William Williford was opposed to his mother hiring John Baker, the State claims, because he disliked the Bakers, and wanted to control his mother's premises. The defendant claims that Baker would talk disrespectfully of young ladies with whom he associated, and moreover that said John Baker was making love to Annie Hughes with no good intent, she being a mere child. There is proof going to show that defendant said he would kill Baker if his mother hired him. Annie Hughes told her uncle Will, the defendant, that she and John Baker were going to marry but she was not in earnest, and she told defendant so. On the morning of the day of the homicide the parties were in the town of Rowlett, a few miles from their home. It seems that Williford, the defendant, had asked deceased to loan defendant his horse, and Baker being angry about something he had heard, told the defendant not to ask him for any more favors. He furthermore threatened to whip the defendant if the defendant intermeddled any more in his (Baker's) business. The deceased had his open knife in his hand during this quarrel, and during the quarrel put it in his pocket, but again during the quarrel got out his knife the second time and opened it. Defendant claims that he said to deceased in the quarrel: "I want no words with you here. When I get before my mother I will repeat what I have said." The parties separated without violence, and there is no proof that they met again until that afternoon when they had got to Mrs. Williford's, when the homicide occurred. Upon their arrival at Mrs. Williford's house, the deceased was seated on the steps of the front porch facing east. This position is immediately in front of the hall door, entering from the porch. Defendant and his brother Henry and his mother were in the rear part of the house. Henry having missed his dinner, he and his mother went in the dining room. Miss Annie Hughes was in the kitchen. These parties had just separated on the kitchen porch, from which Annie Hughes saw through the hall that Baker was seated on the front steps. The witnesses were not anticipating any trouble. Defendant passed into the hall from the rear or kitchen porch, and says he in-

tended turning into the north room to play on an organ as was his custom. He says that, seeing Baker he said to him, "I am ready to go before my mother and settle our little difficulty." That the deceased jumped up and ran his hand in his pocket and advanced on defendant. Defendant says he backed away into the hall and told Baker to "stand back," but Baker kept advancing on him, that he then drew his pistol and shot the deceased. No witness except the defendant saw the shooting. They heard no part of the trouble except Annie Hughes, who says she heard defendant about the time of the shot, tell the deceased to "stand back." The deceased was shot in the forehead, and fell forward, face down. The parties from the kitchen, and dining room rushed in, and saw the deceased lying in this position, and the defendant, pistol in hand, standing several feet back in the hall. He stated that the defendant was advancing on him with a knife when he shot him. A knife was found in the pocket of deceased, but none was seen in his hand or on the floor. The defendant remained around the yard a short time, then went away, but returned home that night about 11 p. m. and surrendered to the Justice of the Peace and constable who were there.

During the trial defendant reserved eight bills of exception to the rulings of the court in the admission of evidence. (See appellant's brief for these exceptions.) The matters illustrative of these bills are sufficiently stated in the opinion.

*Seay & Seay,* for appellant.—Mrs. Lizzie Williford, the mother of defendant, was put on the stand as a witness for the State. She was a witness in rebuttal. The defendant had requested the court to compel the State to put her on the stand before the State rested in chief. But the court refused, and the defendant having closed without using her, the State used her in rebuttal. It is not pretended that the State was surprised at any of the testimony of this witness. It is nowhere so stated, and the refusal of the State to use her in chief, shows conclusively that they knew what her testimony would be. Moreover, their refusal to do so when the defendant tried to force them, is conclusive upon this point. It is developed by these three bills of exceptions that the object of the State was to ask her certain questions, knowing that her answers would be unfavorable, or that she would deny any knowledge of the facts, and then proceed to impeach her by proving different statements made by her, and thus get before the jury the fact of her former testimony, and by force of this testimony establish facts which they could not prove on the trial by this or any other witness. We think they went so far with this, that had she been defendant's witness, and put on the stand by him, a portion of the attack would be illegal and sufficient to reverse the case.

1. The first question asked Mrs. Williford was, if the defendant did not tell her (the witness) that if she hired John Baker, he (defendant) would kill the said John Baker. To this the witness answered that he did not. And further on said she had forgotten whether he did or not.

She was then asked what she said to the grand jury; this was objected to on the ground that it was hearsay, and besides the witness should not be compelled to divulge what was said to the grand jury. The witness was allowed to answer over defendant's objections, and she said substantially, that she could remember no such testimony. The same question was propounded to her in reference to what she said to Squire Swim on this subject, and she denied remembering such conversation with Swim. Subsequently, John H. Traylor and W. A. Nason, two members of the grand jury, were asked if Mrs. Williford did not state while before the grand jury, that the defendant told her that if she hired John Baker, that he (defendant) would kill him. To this the defendant objected, but they were allowed to testify one positively, the other substantially, that she did so state.

2. This witness was asked if the defendant, her son, did not tell her at the house, soon after the killing, "If you don't leave that man alone and hush, I will shoot him again." The witness denied remembering any such thing. The predicate was then laid by asking her if she did not tell Alex Nelson this after he arrived at the house (the defendant not being present). The defendant interposed proper objections also to this evidence and also when Nelson was put upon the stand, but the court overruled them all, and the witness testified that Mrs. Williford did make such statements, to all of which defendant took his bill of exceptions.

3. Mrs. Williford was asked if when she rushed into the hall and saw that Baker was killed, she did not say to the defendant: "You have killed him without a cause." The defendant objected to this on the grounds that, if she did, it was merely the expression of an opinion by a person who did not know the facts, and for other reasons given in the bill the defendant should not be bound by it. The witness, however, was made to answer, and she said substantially that she did not know what she did say, as she was so badly alarmed.

Subsequently, Joe Sinclair was on the stand, and the court allowed him to state, over defendant's objection, that Mrs. Williford said in his hearing, shortly after the killing, that defendant had killed deceased without a cause, and then, after a predicate was laid, he said he heard Mrs. Williford say that to the defendant.

When it is admitted that all this testimony came from the State's own witnesses, it seems too plain for argument that it was simply proving against the defendant the purest hearsay. It was simply proving that Mrs. Williford had said things outside of the court which she now declines to swear to. There is no pretense that the witness procured herself to be put on the stand, and then said things hurtful to the State. On the contrary, they knew how she would testify, and she simply declined to testify favorably to the State about certain matters that she had said outside of the court, and before she was on the stand. The widest stretch of the rules as to impeachment of one's own witnesses does not touch the case, or make of it anything but an effort upon the

part of the State to work in evidence that cannot by any rule of con-
struction be made anything but pure, unadulterated hearsay, and it was
not only hurtful to defendant, but manifestly it was this evidence in
connection with other equally as illegal that secured his conviction.   If
authorities are needed, the court is referred to Willson's (New) Crim.
Stats.   Code Crim. Proc., Art. 795, and cases cited.

It is true the defendant, seeing that he was to be convicted on hear-
say evidence, and after doing all in his power to prevent such evidence,
asked the court to control it in his charge, and the court gave a
special charge, telling the jury as to a part of this evidence, not to con-
sider it as evidence of defendant's guilt.   Any lawyer, or any court
knows that such a charge does but little good, and hence, to hold that
a defendant has waived his legal rights by asking the judge to control
the evidence would be to hold that the defendant would never dare to
ask the judge to break the force of hurtful, illegal and hearsay evidence.

The trial court could secure a conviction and make it hold in every
case by allowing floods of illegal evidence to come before the jury and
then tell the jury not to consider it, when the judge knows that it is as
impossible to stop the jury by special charge from considering such
evidence as it would be to stop a prairie fire with a breeze.   It is im-
possible for a judge even to limit its injurious effects, much less con-
trol it.

It is further submitted that the rule that impeaching evidence should
be limited by the judge in his charge, applies only to cases when the
impeachment is legal.   It has never been held that illegal and hurtful
evidence, which is not impeaching evidence but mere hearsay, can be
thus let in by the judge and then he attempt to control it by his charge.
That this is nothing but hearsay, as characterized in defendant's bills of
exception, and not impeachment evidence at all.   See, Erwin v. State,
32 Tex. Crim. Rep., 519; Bennett v. State, 24 Tex. Crim. App., 73;
Thomas v. State, 14 Tex. Crim. App., 70.

4.   A like error was committed by the trial court when Annie Hughes
was on the stand as a State's witness; she testified that she heard de-
fendant at the time of the shooting say to the deceased, "stand back."
Over defendant's objections the said witness was compelled to testify as
to what she said before the grand jury.   It is true the State did not
follow up this impeachment by putting on the grand jurors as in Mrs.
Williford's case.   But their purpose was acccomplished was the reason
they did not do it.   When the witness answered, "I don't know
whether I did or not," all the injury was done and the full purpose of
the State was served.   Not having denied it positively the jury took it
for granted that she did say it.   Had she answered that she did say it,
certainly it would have been hearsay.   The question being illegal, her
answer could not make the testimony legal.

5.   If there were no other error in this cause, except as contained in
bill of exceptions No. —, this case should be reversed.   We ask not
only that the court look at the evidence, but at the questions asked,

and the treatment of the defendant before the jury. While the defendant was on the stand the State's Attorney asked, "Is it not a fact that you had spent your part of your father's estate and were staying at your mother's, and you were so worthless and drunken that your mother could not get you to attend to her business, and had to hire John Baker to attend to her business, etc." The attorney for the defendant made the legal objections that defendant had not opened his character, that the proposed evidence was irrelevant, and shed no light on the case, and furthermore, that the question was improper, disrespectful, and hurtful to the defendant. But the defendant himself personally appealed to the court to protect him, the court, however, curtly telling him, "you will answer the question." He was also asked if he was not in the habit of carrying pistols, and fighting, and if he and his wife had not separated. Both the defendant's counsel, and the defendant himself undertook to keep out this evidence, the former making a large number of legal objections, and the defendant personally asking to be protected from dragging in his family affairs which were in no way connected with this case. The court instead of sustaining these objections, proceeded to admit the testimony, and over defendant's exceptions, made a long and hurtful talk to the jury, as to why he did so, which was directly in violation of Art. 767, Code Crim. Proc., and the cases cited thereunder. (See, Willson's (New) Crim. Stat., p. 263). This court is here referred to this language and act of the trial court as set out in the transcript,

Not only was the defendant forced to testify as to these matters, but the mother, Mrs. Williford, over defendant's objections, was interrogated and compelled to answer in regard thereto. When she had failed to answer as satisfactorily as the State seemed to have hoped or expected, then the grand juror, W. A. Nason, is again called on. Although by so doing we may somewhat impair our appeal to this court as to the injury inflicted by Nason's testimony, we feel impelled to call the court's attention to this fact. It seems that Mr. Nason was secretary of the grand jury and kept full notes on the evidence. When other grand jurors and other witnesses were called, as against the old mother, it was easy to impeach her; but in no event where Mr. Nason's notes were called in were they able to show either by his notes, or by his testimony that she contradicted what she said before the trial court. In a former bill the foreman impeached her, while Mr. Nason and his notes really sustained her. In this instance now being discussed when Mr. Nason's notes were produced, the bold attack of State's attorneys upon the old mother was shown to be groundless.

This certainly illustrates the danger of allowing outsiders to come in and swear second hand at matters that are pure hearsay, and establishes the wisdom of the rule which has been so often broken in this case— that the witnesses must in person swear away the life or liberty of a man, and that it shall not be done under the cloak of impeachment or in any other way, when it is merely the recollection of one witness as

to what another person has said. We do not deem it necessary to cite any authorities to show that the rules of evidence were violated to the great hurt of this appellant, by reason of the acts and facts set forth in the bill of exceptions first discussed.

A reference to the statement of facts will show that the defendant claimed the only trouble between him and the deceased (John Baker) was that caused by Baker's attention to the young girl, Annie Hughes. He says that both Baker and the girl had told him about it, and for this reason, and because the girl was so young, had no father or mother; that the young man was jealous hearted, was paying attention to other young ladies, and after he got a little familiar with a girl he would talk about her, how he could handle her, etc. Let it be borne in mind, however, that all this was called out by the State. In his examination in chief defendant said he expected no trouble with John, but that he and Jim Baker were not friendly. Even when cross-examined on this matter by the State, he said that the little trouble about the girl he thought was all over, and he had been sleeping with John, and had asked favors of him. He did not know that John was mad at him until the morning of the killing, when they met at Rowlett. The State had also put Annie Hughes on the stand, and proved by her as a State's witness that she had told defendant of her intended marriage with John Baker, but that it was only in fun. Now, after all this had been called out by the State, and not by the defendant, the State pursued the following course:

In order to break the force of this point called out by themselves, the prosecution put A. C. Baldwin on the stand as a rebuttal State's witness, and asked him if he ever heard John Baker, or heard of John Baker talking about young ladies in a vulgar, slighting way. We do not claim that the State opened the character of the deceased. Had they undertaken this, it would have been equally objectionable. The defendant objected to the State being allowed to prove the habit, or want of habit, as to young Baker on the grounds that it was incompetent, hearsay, irrelevant, immaterial, shed no light on the issues, and injurious to defendant and his case. The witness was allowed, over defendant's objections, to answer, "That he never heard of such a thing." Then the court examined the witness on this subject. The defendant objected to the court doing this, as such acts would prejudice defendant's cause before the jury. Subsequently, the same course was taken, and the same evidence was obtained from two other witnesses, A. F. Poory and T. K. Flowers, the court examining the witnesses over defendant's exceptions, etc.

We do not believe a citation of authorities or an argument is necessary to convince this court that the evidence itself set out in this bill was both hurtful and inadmissible, and that the injury to the defendant was intensified by the court's action in this matter, he seeming to attach so much importance to this testimony that he, for the time being, takes the reins from the prosecution, and gives each of the witnesses a personal examination.

*Mann Trice*, Assistant Attorney-General, for the State.—It appears that the appellant became angry at deceased (Baker) because deceased was employed by appellant's mother, and he threatened, before the killing, that if his mother employed deceased, he would kill him.   On the day of the homicide, appellant and deceased had some words at Rowlett, a few miles from the scene of the killing.   The deceased returned to Mrs. Williford's, the mother of appellant, where he was employed. Soon after the deceased came to the house, and about supper time, defendant shot and killed Baker.   There were no eye-witnesses to the killing, Mrs. Williford and her son being in the dining room, and Miss Hughes in the kitchen at the time.   When the shot was heard, all of the parties repaired to the scene of the killing, and found deceased in a dying condition in the doorway.   The inquest was held, and from the undisputed testimony in the record, deceased was unarmed, save and except a small pocket knife that was in his pocket, closed.   The evidence amply sustains the verdict, but it is insisted that the court erred in its rulings in relation to testimony:

1.   In permitting State's counsel to ask witness, Annie Hughes, a question, having for its purpose the laying of a predicate upon which to contradict said witness.   An examination of this bill will show that the witness answered, "I do not know whether I did or not."   Without considering the question whether this was a sufficient predicate upon which to contradict the witness, the same was expressly admissible under Art. 755, Code Crim. Proc., which provides, that when facts stated by a witness are injurious to his case, the witness may be attacked in any manner, except by proving bad character of the witness.

2.   There was no error in the court refusing to require the State to place Mrs. Williford and her son upon the stand, as it is not shown that they were eye-witnesses to the transaction, but, on the contrary, this bill shows there were no eye-witnesses to the transaction.   It was, therefore, competent for the State to prove the killing by circumstances, and was not bound to introduce all the witnesses in the neighborhood.   The witness, Mrs. Williford, however, was afterwards introduced in rebuttal of statements made by appellant.

3.   The third bill of exceptions complains more of the asking of what is termed an illegal question of the defendant while he was on the stand, and does not show that any testimony hurtful to the defendant was elicited.   The matter of other offenses being inquired into was permissible, as when he took the stand he waived all right to keep anything back, even to the extent that he would not be protected in answering questions which might tend to incriminate him.   See, Quintana v. State, 29 Tex. Crim. App., 406.

4.   In reference to objections to questions asked Mrs. Williford by the State, it will be noted that Mrs. Williford was put on the stand by the State to rebut certain statements made by defendant.   Whereupon the defendant, on cross-examination, elicited new matter not inquired about by the State on its examination in chief, and to this extent Mrs.

Williford became appellant's witness. An examination of her testimony will show an attempt to exculpate appellant by seeking to show a declaration made by appellant that the deceased had rushed toward him with a knife. It was, therefore, competent for the State to inquire of her on cross-examination and draw out any matter tending to impeach her on that point, or any other exculpatory fact to which she testified and about which her declarations had been different before the grand jury, and soon after the shooting, while defendant was present and the deceased was yet alive. But even grant that she was the State's witness, for all intents and purposes, it is clear that her testimony on the trial was contrary to her testimony before the grand jury, and her declarations made at the time of the killing, and that this testimony is injurious to the cause of the State, therefore, under Art. 795, New Code Crim. Proc., and authorities there cited, the testimony was admissible.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at twenty-five years in the penitentiary, and he prosecutes this appeal. In order to present the bill of exceptions, we will first summarize the evidence: The killing occurred at the house of Mrs. Williford, the mother of appellant, who lived in Dallas County, a short distance from the town of Rowlett, some time in December, 1894. The deceased had hired to Mrs. Williford to farm on her place during the year 1895, and had moved to her house, and was living there at the time of the homicide. Defendant at the time was also staying at his mother's when not working out at other places. On the morning of the day of the homicide, the deceased and defendant met at the town of Rowlett. It appears that they had a difficulty there. What occasioned it is not made clear. Defendant testified that he asked the deceased for the loan of his horse to ride a mile and a half to invite a young lady and gentleman to a dance that night, and that the deceased got mad, and drew his knife, and threatened to whip him, and told him, if he ever crossed his path again he would hurt him. The defendant told the deceased that when he got home he would repeat the words he said before his mother. These words seem to have had some connection with appellant's opposition to the employment of the deceased by Mrs. Williford. It appears that the deceased preceded the defendant home; at least, when defendant arrived there, the deceased was sitting on the front gallery of Mrs. Williford's house, the gallery being in front on the east side of the house. Defendant came in through the back part of the house. It appears Mrs. Williford and her son Henry were in the kitchen, and Annie Hughes was also somewhere in the rear portion of the house. Defendant came through the hall towards the front part of the house, and, according to his testimony, about the time he reached the door of the hall, accosted the deceased, and said, "Now, we will go before my mother and settle it," and that deceased arose, ran his hand in his pocket, advanced rapidly towards defendant, and he shot him in apprehension that he was about to be at-

tacked with a knife. The bullet took effect in deceased's forehead, and he fell right in the hall door, his body being partially in the hall, and his feet extending out on the gallery. No one but defendant saw the homicide committed, and the State's case in rebuttal of the defendant's theory of self-defense is made up of circumstantial evidence. The theory of the State was that there had been bad blood existing between the parties, beginning with the employment of the deceased by Mrs. Williford; and the State proved that the defendant said, if his mother hired him he would kill him; and the tendency of the State's evidence was to show a willful and malicious murder, engendered on account of this employment of the deceased by the mother of the defendant. Defendant's testimony in regard to the origin of the bad feeling between them tended to show that it was not on account of said employment, but because the deceased was paying attention to Annie Hughes, his niece, some 14 or 15 years of age, and he claimed that this attention was for no good purpose. No weapon was found on the person of the deceased save his pocketknife, and that was in his pocket. Appellant, in his first bill of exceptions, objects to the contradiction or impeachment of Annie Hughes, who was the State's witness. The State had examined this witness, and had proved by her a part of the circumstances attending the homicide, of an inculpatory character. In that connection she stated that she never heard John Baker say anything at all, if he said anything; when she saw him, he was not doing anything; he was just lying there struggling, and catching his breath hard. And, although she was examined fully, she stated nothing about having heard the defendant say anything. On cross-examination, however, she stated that, just before the shot was fired, she heard defendant say, "Stand back." This was an affirmative fact; and, in connection with the testimony of the defendant, was very important. It was hurtful to the State. This testimony, coming as it did, apparently was a surprise to the State. If it was not, the bill should have negatived this idea. As stated before, it was certainly injurious, and we think the State had a right to lay a predicate by the witness, Annie Hughes, on this branch of the case, in order to contradict her by a member of the grand jury. See, Code Crim. Proc., Art. 795; Bennett v. State, 24 Tex. Crim. App., 73; Self v. State, 28 Tex. Crim. App., 398; Thompson v. State, 29 Tex. Crim. App., 208. As stated before, no person saw the homicide except the defendant, and the State's case consisted of witnesses who testified to circumstances connected with the killing. There is no rule of law to compel the State to put on every witness who may have been near and knew of any circumstance connected with the killing. And there was no error in the refusal of the court to compel the State to put Mrs. Lizzie Williford, or her son, Henry Williford, on the stand. See, Kidwell v. State, 35 Tex. Crim. Rep., 264. Bill of exceptions No. 3 presents a number of objections urged to the cross-examination of the defendant when he was on the witness stand. Over his objection, the State was permitted to prove that the defendant had

been fined twice in the Justice Court for fighting. It is held in this State that it is competent to prove by a defendant, as going to his credit, that he has been convicted of a felony, or of such misdemeanors as impute moral turpitude, but not such as do not impute moral turpitude. Mere assault and battery is not such an offense as carried with it this imputation. See, Brittain v. State (decided at present term of this court), ante p. 406. The State was also permitted, over the objection of the defendant, to ask him the following question: "Is it not a fact that you had spent your part of your father's estate, and was staying at your mother's, and you were so worthless and drunken that your mother could not get you to attend to her business, and had to hire John Baker to attend to her business for her, and that was what you were mad about, and there was nothing on earth between this niece of yours and John Baker—isn't that a fact?" We believe it was competent for the State to show by this witness, by proper questions, that appellant got incensed at deceased because his mother would not hire him, and hired deceased, and that this was the occasion of the ill feeling between him and deceased, and not because of any apprehension on account of his niece, but not that he had spent any part of his father's estate, and was so worthless and drunken that his mother could not get him to attend to her business. It was not competent to prove or attempt to prove by appellant why his wife left him. Nor was it competent to place Mrs. Williford on the stand for the purpose of contradicting the appellant as to these matters. Much less was it competent, after Mrs. Williford had failed to impeach the defendant, to put W. A. Nason, a member of the grand jury, on the stand, for the purpose of impeaching her in regard to same. As stated before, it was perfectly competent, in the examination of the defendant, to prove by him, if it could be done, the fact that Mrs. Williford hired John Baker instead of her son, and that her son was angered on that account, and also to prove the same fact by any other witness who knew it.

Mrs. Williford, who had been introduced as a State's witness, was recalled to the stand, and, for the purpose of laying a predicate to contradict her, was asked the question, "Did you not state to the defendant, in the presence of Joe Sinclair, that he (the defendant) had shot the deceased without cause?" And thereupon she stated that she did not remember whether she said this or not. The said Joe Sinclair was placed upon the stand, and on examination stated that he was at the house of Mrs. Williford a short time after the shooting, and that she stated to the defendant that he had shot the deceased without cause. It will be borne in mind that Mrs. Williford was a State's witness, and in this connection it does not appear that she had stated any affirmative fact hurtful to the State, but that she was simply placed upon the stand in this connection to lay a predicate for her contradiction. Under the authorities this could not be done. We are not to be understood as holding that it was not competent for the State to prove, as original evidence, that Mrs. Williford, or any other witness, charged appellant killed deceased with-

out provocation, and that he stood mute. Such testimony, under proper circumstances, has always been admitted as confessions. See, Art. 795, Willson's New Code Crim. Proc., and authorities cited. Mrs. Williford was also asked "if defendant, immediately after the shooting, did not tell her that, if she did not shut up, and leave that man alone, he would shoot him again." She denied having made this statement. She was then asked if she did not state, in the presence of Alex Nelson, immediately after the shooting, and as soon as Nelson got to the house, that defendant said to her, "If you don't leave that man alone, and hush, I will shoot him again." She was compelled to answer this question, over the objection of the defendant, and she said that she did not remember making any such statement. And thereafter said Alex Nelson was introduced by the State, and, over defendant's objection, the State was permitted to prove that she did make said statements to him. As stated before, Mrs. Williford was a State's witness, and she could only be impeached by contradictory statements in case she made some affirmative statement hurtful or prejudicial to the State, and calculated to surprise the State.

In the sixth bill of exceptions, the defendant also shows that Mrs. Williford was asked by the State's attorney, "Didn't the defendant tell you that if you hired John Baker he would kill him?" to which the witness answered that "she did not know that he did, but that she had forgotten now whether or not he did say that." She was then asked if she did not make such a statement before the grand jury. This question and the proposed answer were objected to by the defendant, which was overruled, and the witness answered that she did not so tell the grand jury. She was also asked if she did not make the same statement to Squire Swim, and she responded that she did not, but, if she did, she didn't remember it. Subsequently John H. Traylor, a member of the grand jury, was put on the stand, and, over the defendant's objection, the witness was permitted to state that Mrs. Williford did make said statement before the grand jury. On the examination of this witness it was perfectly competent for the State to prove by Mrs. Williford that defendant declared to her, before the killing, that, if she hired John Baker, he (defendant) would kill him. If she denied that he made such statement to her, the State's investigation on the subject was at an end, and it was not within the power of the State to show by other witnesses that she did make said statement, and thus get incompetent testimony before the jury. If, in answer to the question, she had not only denied that he made the statement, but had gone further, and said some affirmative declaration that defendant may have made to her at the time that was hurtful to the State, in that contingency alone, she being a State's witness, would it be permitted to prove by some other witness that she made the statement, at another time and place, on the same subject, beneficial to the State, and in contradiction of the affirmative testimony delivered by her. This contingency did not occur as to this witness, and this indirect method of getting before the jury hearsay testimony

prejudicial to the defendant was not authorized. Nor, as to this char·
acter of testimony, presented in several bills, and heretofore discussed,
was the evil cured by the charge of the court, delivered at the *instance*
of the appellant, instructing the jury that they could only regard it for
impeachment of the witness. The testimony was not competent for im·
peachment purposes, and its admission was error. And, notwithstand·
ing the charge of the court, the jury must have been impressed with the
idea that, as this State's witness, Mrs. Williford, had declared to others
,that the defendant made these incriminating statements to her, they
were true in fact, though no witness testified to them, and they would
be constrained to use the same as evidence against the defendant. If the
court, after the admission of this testimony, had expunged it altogether
by a charge, it would not have relieved the case from the injury which
this improper evidence engendered. In the examination of the defendant,
he stated that his reason for objecting to his mother hiring John Baker
was on account of his niece, Annie Hughes; that John Baker was pay-
ing attention to her; and that he had the reputation of getting intimate
with young ladies, and slandering them. We think the testimony of
witnesses showing that such was not the reputation of John Baker was
admissible in evidence in this case. No objection was made to the
charge of the court, but the defendant assigns as error the giving of cer·
tain portions of said charge, and also that the court erred in refusing to
give certain special instructions asked by him. Appellant especially
criticises the charge of the court on self-defense, and he insists that said
charge is improper, and not the law. Without discussing the charge,
we would remark that the charge is perhaps longer than is necessary,
and does not present the issue of self-defense as compactly and clearly
as it should. All that was necessary in this case, on this branch of it,
was to tell the jury, if they believed that the deceased first attacked the
defendant, or it reasonably so appeared to the defendant that he was in
the act of attacking him, and that he was in the act of drawing a knife
on the defendant, or it reasonably so appeared to the defendant, and that
defendant reasonably believed that his life was in danger, or his person
in danger of serious bodily injury, from such attack, and he then drew
his pistol, and shot and killed the deceased, it would be in self-defense.
For the errors heretofore discussed and pointed out, the judgment of the
lower court is reversed, and the cause remanded.

*Reversed and Remanded.*