## J. R. Hall v. The State.

### No. 2498.  Decided June 4, 1913.

**1.—Murder—Jury and Jury Law—Bill of Exceptions.**

In the absence of a bill of exceptions to the action of the court in hearing testimony on motion for new trial, with reference to the complaint that two of the jurors who served had expressed themselves against defendant, a bill of exceptions filed thirty days after adjournment of the court below comes too late, and it must be presumed that the evidence supported the judgment overruling the motion.  Following Knight v. State, 64 Texas Crim. Rep., 541, and other cases.

**2.—Same—Evidence—General Reputation—Chastity.**

Where defendant was tried and convicted for the murder of his wife, there was no error in excluding testimony of the general reputation of deceased as being bad for virtue and chastity.

**3.—Same—Evidence—Impeachment of Witness.**

Where, upon trial of murder, the court excluded testimony with reference to other parties being intimate with the deceased, which was entirely immaterial matter and upon which they could not have been impeached, there was no error.  Following Holsey v. State, 24 Texas Crim. App., 35, and other cases.

Appeal from the District Court of Gonzales.  Tried below before the Hon. M. Kennon.

Appeal from a conviction of murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

The opinion states the case.

*C. K. Walter,* for appellant.—On question of refusing testimony as to intimacy of third party with deceased: Murphy v. State, 36 Texas Crim. Rep., 24; Cooper v. State, 19 Texas, 450.

*C. E. Lane,* Assistant Attorney-General, for the State.—Cited cases in opinion.

PRENDERGAST, Judge.—Upon an indictment charging appellant with the murder of his wife, a trial resulted in his conviction of murder in the second degree with a penalty of twenty years confinement in the penitentiary assessed.

It is unnecessary to give any detailed statement of the evidence.  It was amply sufficient to show that at the time of the alleged murder appellant was about fifty-nine years of age and his wife thirty-five years of age.  The deceased was appellant's third wife; they married about one year before the killing.  Several months before the killing trouble arose between the parties and they separated.  They afterwards made up and lived together until some three or four weeks before the killing.  They had lived in the country.  Some three or four weeks before the killing trouble arose between them and the deceased was seen to chase appellant out of their house and around an outhouse and to commit an assault and battery upon him.  He made no resistance.  On this occa-

sion she was very abusive of him and used indecent and profane language to him.  This resulted in their separation again.  He left where they were residing first, going to his son's, she leaving also, perhaps, the same day or the next day, going to the town of Gonzales.  She rented a two-room house in Gonzales and lived there alone for two or three weeks after their separation and until she was murdered.  Appellant was very anxious to get his wife to live with him again.  He also removed from his son's to Gonzales and began to work in the town.  He complained to several of his friends of his family trouble, told them of his love for his wife, and his desire to get her to live with him again. He interceded with the county attorney and induced the county attorney late Sunday evening, before she was killed that night, to see her for him to see if she couldn't be induced to live with him again.  The county attorney called on her just before night Sunday evening and had a talk with her at appellant's instance along the line desired by him, but she declined to live with appellant again.  The county attorney at once so advised appellant, and appellant may have asked the county attorney if there would be any harm in his (appellant's) going to see his wife and tell her good-bye, and then himself leave the country.  He told some other of the witnesses that they both could not live in the same town together, and indicated that he was going to leave there permanently. Soon after the county attorney had this conversation with appellant's wife and reported the result to appellant, he himself went to see her. Appellant testified, in effect, that he went to the house where his wife was just before night and just after the county attorney had reported to him; that he knocked at the door and called her, but he had no response from her.  He thereupon opened the door to the front room and she then came out of the back or shed room into the front room where he was, and asked him, "What are you doing here?" and some conversation occurred between them; that he sat down on the side of the bed at one end and she on the other end on the same side, and that they thus sat and talked for some half hour; that notwithstanding this was in December it was quite a warm day and he pulled off both his coat and vest and hung them on a chair near the bed; that he had pinned on his coat or vest at the time a small picture of himself, and, seeing her noticing it particularly, he took it off and give it to her; that he and his wife sat there on the bed some thirty minutes.  Among other things he testified:  "Then she got up, and just turned around in the floor like, right out sort of to one side and says, 'You had better leave here right now,' and was rubbing her hands this way (illustrating) and says, 'There will be a man here directly that will kill us both.'  I said, 'If that is the case I will leave, I wouldn't have hurt you for nothing on this earth, I love you too well.'  I just reached over and picked up my coat and out I went, and I didn't know at the time but what I had the vest, too."  Again he testified:  "There was no one there except she and I, that I know of.  I had heard no one walking in the other room and had heard no one talking.  I heard a noise in that other room, it

was a noise something like paper rattling, something like that, or maybe a little heavier noise than that, that is all I heard. I had been there something like twenty or thirty minutes, or maybe not but fifteen minutes, when I heard that, I don't know exactly, and I stayed there about five or six minutes, or maybe ten minutes after I heard that noise."

He claims that when she told him to leave, as above shown, he did so, picking up his coat off of the chair and thinking that he had his vest, too; that he walked out of the door and after getting off some distance heard his wife say, "Why, that's my husband," looked back but saw no one and went on down to the railroad and after passing some Mexicans he got out his knife, cut his throat, stabbed himself several times in the breast with the knife, then jumped in the river to drown himself, but that the water was so cold it like to have frozen him, he came to himself, got hold of a limb, called for help and some Mexicans came and rescued him. About the middle of the next morning someone saw where blood had run from the house where deceased lived, out on the ground. The officers were notified; they then went down to the house where deceased was and found her sitting on the edge of the bed, dressed, except that one shoe was off, with her head leaning forward and her shoulder resting against the side of the wall. An axe was found at the foot of the bed and her head crushed, evidently by a lick from the axe, which crushed her skull, over her right eye, across her nose and her left cheek bone. Blood had run profusely over all the bed, the floor and other places. Appellant's vest was found on this chair with blood stains on it. It is useless to further describe what was found in the house. The woman was dead and stiff when found.

The woman had rented the house from a man by the name of Stahl. Stahl was an important witness for the State. Among other things he testified that he passed this house where the woman was late Sunday evening and saw her then sitting in the room in her rocking-chair, the door partly open. That later he went down in the same locality to get his milch cow. This was just about dusk, or before night; that he then saw appellant come out of this woman's house and close the door after him and that appellant started in the direction where soon after he attempted suicide by both cutting himself and throwing himself in the river.

Appellant has but three bills of exceptions and no questions raised otherwise. By the last of these he complains that two of the jurors were incompetent and before they were taken upon the jury had expressed themselves against appellant. The court heard evidence on this ground of appellant's motion by several witnesses and overruled appellant's motion. No bill of exception was filed to this action of the court showing this testimony until nearly thirty days after the court adjourned. Under the statute and the uniform decisions of this court this bill was filed too late to be considered by the court and we must presume that the action of the court was correct and justified by the evidence heard. Knight v. State, 64 Texas Crim. Rep., 541, 144 S. W. Rep., 967, and

cases therein cited; Brewer v. State, 153 S. W. Rep., 622, and many other cases unnecessary to cite.

By another bill appellant complains that the court refused to permit him to prove by several witnesses that the general reputation of his wife, the deceased, for virtue and chastity in the community in which she lived was bad. This evidence certainly was not admissible for any purpose.

The other bill shows that while the State's witness Stahl was on the stand he asked him if it was not a fact that about two or three nights before this killing he was at the deceased woman's house after dark, trying to gain admission, and that she would not let him in; and further, if on that occasion he did not state to her that he would be around in the morning and bring her some wine, to which questions Stahl emphatically answered in the negative. He then proposed to prove by his witness Julius Wade that he, Wade, was at the house on this occasion and stayed all night with the woman for immoral purposes, and would have testified that said Stahl did come to said woman's house two or three nights before her death and tried to gain admission thereto, and that she would not let him in, and that he then stated to her that he would be around the next morning and bring her some wine. · The State objected to this proposed evidence by Wade because by it appellant sought to impeach the State's witness Stahl upon an immaterial matter. The court sustained the objection and excluded the testimony. The bill shows, as stated above, that Stahl was an important witness for the State and gave material and pertinent testimony against appellant. He claims that his object and purpose in seeking the introduction of this evidence was to contradict and impeach Stahl; also to show the bias of said witness and the probable interest of said Stahl, and that other men than appellant and other than the husband of said woman were accustomed to and in the habit of visiting her house at night, and that such other persons might have, and probably did take the life of the deceased, and not appellant, and to weaken the cogency, if it had any probative force, of the circumstance and fact of appellant's presence at the house of the deceased on the night of the homicide and for corroborating his testimony.

While it is always permissible for either side to show the bias and prejudice of any witness against him, yet testimony sought for this purpose must have some probative force to so show. It is never permissible to impeach a witness on immaterial matter. See section 1109, page 722, White's Ann. C. C. P. for a collation of some of the cases. Evidence that any witness associated with lewd women is not admissible for the purpose of impeaching the witness. Holsey v. State, 24 Texas Crim. App., 35; Arnold v. State, 28 Texas Crim. App., 480; Drye v. State, 55 S. W. Rep., 65; Hudson v. State, 41 Texas Crim. Rep., 453; Reed v. State, 42 Texas Crim. Rep., 572; Neill v. State, 49 Texas Crim. Rep., 219.

We can not see how this testimony could have been admissible for any legitimate purpose in this case, or how it could have tended to show whether some other than appellant killed the deceased. In our opinion the court did not commit reversible error as claimed by either of appellant's bills. There being no reversible error the judgment will be affirmed.

*Affirmed.*