## Frank Finks v. The State.

### No. 4998. Decided February 5, 1919.

#### 1.—Murder—Change of Venue—Sufficiency of the Evidence.

Where, upon trial of murder, defendant filed an application for change of venue based upon both grounds of the statute, which was overruled and a venire of 300 men was exhausted on account of developments in the investigation of the jurors on their voir dire and other reasons to their examination, when the motion to change venue was renewed, and the evidence in support thereof showed that there was a prejudgment of the case by practically ninety-five per cent of the jurors of the county, and also a strong combination of influential men, etc., the motion should have been granted and the venue changed.

#### 2.—Same—Evidence—Impeaching Witness.

Where, upon trial of murder, defendant's brother-in-law testified in his behalf only as to facts at the place of the homicide, and the State was thereupon permitted on cross-examination to show that this witness had visited the defendant in jail two or three times, and thereupon was permitted to ask the witness if he did not tell the sheriff and others if they would go to the house of one of the State's witnesses that they would find the watch of the deceased, etc., all of which the witness denied, and the State was then permitted to introduce witnesses to contradict witness, the same was inadmissible and reversible error.

#### 3.—Same—Rule Stated—Impeaching Own Witness—Conversations of Third Parties.

The rule is well settled that under such circumstances, that having failed to elicit the testimony, the State would be bound by witness' answers and would not be permitted to get before the jury the statements by impeachment; besides, they were conversations between third parties and in no way binding on defendant. Following Ballard v. State, 71 Texas Crim. Rep., 587, 160 S. W. Rep., 718, and other cases.

**4.—Same—Evidence—Contradicting Witness—Predicate.**

Where no predicate was laid to contradict a defendant's witness with reference to a conversation had with a State's witness, said last witness should not have been permitted to testify to such conversation.

**5.—Same—Conversation—Evidence—Telephone—Charge of Court.**

Where, upon trial of murder, the State was permitted to ask a defendant's witness, as well as the defendant, as to a conversation which occurred between them over the telephone, as to improper relations between them, which both denied, the matter should have ended there, and the court should not have charged the jury that they could consider it for the purpose of attacking the credibility of defendant's witness.

**6.—Same—Evidence—Coercing Witnesses—Alibi—Fabricating Testimony.**

Upon trial of murder, where defendant had introduced a witness who testified to an alibi of the defendant, he should have been permitted to show that some of the officers whipped her severely, placed her in jail without process, etc, to make her make statements which she said were not true, and to show further the influences brought to bear upon the witnesses who testified against the defendant, to show how they were maltreated by said officers to make them testify to the things that were not true, and to show a conspiracy between the officers and others to secure the conviction of defendant on false testimony.

**7.—Same—Evidence—Coercing Witnesses.**

Upon trial of murder, where two alleged accomplices testified against the defendant, he should have been permitted to show how these accomplices were whipped and maltreated in order to make them testify against the defendant.

**8.—Same—Evidence—Alibi—Rebutting Testimony.**

Where, upon trial of murder, defendant claimed an alibi, and the State thereupon introduced a witness who testified that the defendant could have been at the scene of the homicide, and that it would only take twenty-five or thirty-five minutes to ride the distance from where he was seen and the place of the homicide, the defendant should have been permitted to show that it would take two or two and one-half hours to ride this distance.

**9.—Same—Principals—Charge of Court.**

Where, upon trial of murder, the State relied upon the theory that defendant and one of the alleged accomplices killed deceased and that both of them shot at him, and the court's charge on principals that if the defendant was present, knowing the unlawful intent of his accomplice, aided him or encouraged him by words or gestures in the commission of an unlawful act, etc., defendant would be a principal, etc., was error, as there was no testimony that defendant was a principal in the sense set forth in said charge, and the court's charge should have conformed to the facts. Following Burges v. State, 33 Texas Crim. Rep., 9, and other cases.

Appeal from the District Court of Falls. Tried below before the Hon. W. A. Patrick.

Appeal from a conviction of murder; penalty, ninety-nine years imprisonment in the penitentiary.

The opinion states the case.

*Nat Llewellyn* and *W. W. Hair,* for appellant.—On question of change of venue: Randle v. State, 34 Texas Crim. Rep., 43; Meyers v. State, 39 id., 500; Streight v. State, 62 id., 453; Cortez v. State, 44 id., 169;

Coffman v. State, 136 S. W. Rep., 779; Sorrell v. State, 169 S. W. Rep., 299.

On question of impeaching own witness: Ballard v. State, 71 Texas Crim. Rep., 587, 160 S. W. Rep., 718, and cases cited in the opinion.

On question of court's charge on principal: Bennett v. State, 80 Texas Crim. Rep., 652, 194 S. W. Rep., 145, and cases cited in the opinion.

Upon question of impeaching own witness: Skeen v. State, 51 Texas Crim. Rep., 39, 100 S. W. Rep., 770; Scott v. State, 105 S. W. Rep., 796.

*E. A. Berry,* Assistant Attorney General, for the State.

DAVIDSON, Presiding Judge.—Appellant was allotted ninety-nine years confinement in the penitentiary under a conviction for murder.

He filed an application to change the venue, based upon both grounds of the statute. These were overruled, and a venire of 300 men exhausted on account of developments in the investigation of the jurors on their voir dire and other reasons incident to their examination. At this point the motion to change the venue was renewed, setting up the former grounds as well as conditions developed by reason of the examination of the jurors. The facts, without going into detail, show that there was a prejudgment of the case by practically ninety-five per cent of the jurors of the county, and also a strong combination composed of quite a number of influential gentlemen who did a great deal of talking about the case, going so far as to threaten persons who had signed appellant's bond, or purposed doing so, when he was granted bail. These threats were political ruin and injury to their standing in the minds of the people. Among other things, quite a number of these gentlemen waited upon the Hon. Tom Connally, who had been elected to Congress, and who had signed the bond, and finally induced him to take his name from appellant's bond. The sheriff and his posse were very active in the prosecution of appellant, as will be more plainly shown by other references in this opinion. Among other things, they whipped witnesses who they placed in jail when their statements did not accord with ideas entertained by the sheriff and those who were operating with him. These whippings were very cruel and without authority of law, and were made to extort statements from the witnesses. Some of these witnesses were placed in jail without warrant or process, and kept incarcerated for varied lengths of time.

If the facts upon another trial with reference to the change of venue, if applied for, are as developed in this record, the court will grant such change.

A bill of exceptions recites that Goodrich, brother-in-law of appellant, testified in his behalf. His testimony related to facts at the place of the homicide. Upon cross-examination the State developed the fact that Goodrich had visited his brother-in-law in jail two or three times. The first visit seems to have occurred about the 28th of July, the homi-

cide having occurred on the 26th. In this connection it is shown that about ten days after the homicide Jordan Israel, a negro, was placed in jail, and it is further shown that he had at his home the watch belonging to deceased. He made conflicting statements as to how he came in possession of the watch, but testified on the trial that he received it from the defendant on the morning of the 27th. His first statement was that he received it from a negro named Tolliver, and in another statement that he received it from the confessed accomplice, Frank Williams, and upon another occasion that he received it from the defendant, and on the trial that he received it from defendant. Appellant did not elicit any testimony from Goodrich with reference to these matters. They were elicited on cross-examination by the State. After eliciting the fact from Goodrich that he visited appellant in jail, State's counsel asked this question: "Did you not some weeks after the arrest of Mr. Finks at one time out in the hall down by the sheriff's office, and another time near the door and the stairway, and another time under those little cedar trees in front of the courthouse each time state to Mr. Plott, if he would go down to Jordan Israel's house he would get that watch?" Mr. Plott was the sheriff of the county. Quite a number of objections were urged. The State was also permitted to show by another witness, Cooley, that about ten days after the killing of deceased Goodrich stated to him that if he, Cooley, would get Mr. Plott to go down to Jordan Israel's house they would find deceased's watch. The State was also permitted to prove by Hemphill that the witness Goodrich, in the Elks hall in Marlin, told him he had been to see Mr. Plott, the sheriff, and he had told Plott that if he would go to Jordan Israel's house he would find the deceased's watch. All these conversations were denied by Goodrich. Subsequently Plott, Cooley and Hemphill were permitted to testify to these conversations. In a sense the State made Goodrich its own witness in reference to those matters, the defendant having brought out nothing with reference to those conversations. The rule seems to be well settled under such circumstances, that having failed to elicit the testimony, the State would be bound by his answers, and would not be permitted to get before the jury these statements by impeachment. The State could not so prove as original testimony. Drake v. State, 29 Texas Crim. App., 265. See, also, Branch's Crim. Law, secs. 867 and 868. These were conversations between third parties and in no way binding on defendant. Nor could the State introduce indirectly such statements of defendant if he made such to Goodrich while confined in jail. These statements were denied by Goodrich, and the matter should have ended there. It is also the rule that the State can not on cross-examination, by attempting to impeach a witness, get before the jury statements that are otherwise inadmissible. In addition to the authorities already cited see Ballard v. State, 71 Texas Crim. Rep., 587, 160 S. W. Rep., 718; Hall v. State, 70 Texas Crim. Rep., 590, 158 S. W. Rep., 272; Casey v. State, 49 Texas Crim. Rep., 174, 90 S. W. Rep., 1018; Branch's Crim. Law, sec. 866; Branch's

Ann. P. C., vol. 1, sec. 10, p. 65, and cases there cited; Skeen v. State, 51 Texas Crim. Rep., 39, 100 S. W. Rep., 770; Williford v. State, 36 Texas Crim. Rep., 414, 37 S. W. Rep., 761.

The court permitted Plott, the sheriff, and others to testify to conversations occurring between Plott and Maggie Heron. The bill recites a predicate was not laid to contradict her with reference to this conversation. Without a predicate the objections should have been sustained. There are bills of exception in the record to the manner of cross-examining the witness Heron, as well as to the charge given by the court in that connection. The State was permitted to ask her, as well as the defendant, as to a conversation that occurred over the phone between herself and appellant while she was at Taylor.' This negro woman had been cooking for appellant for about three years, but had gone on a visit to Taylor. This conversation was had with reference to when she would return to work for him. Among other things, the State asked her if she and appellant had not been acting toward each other in the relation of husband and wife. This was denied by both witnesses, and there the matter ended. This should not have been permitted, but in any event when the court gave the charge to the jury he instructed them that they could consider it for the purpose of attacking the credibility of the witness Heron. Exception was properly reserved to this charge, which should have been sustained and the charge not given. There was no testimony admitted in reference to this matter. The question was asked and denial made. The court was not authorized to assume there was such testimony in the fact of its emphatic denial.

While Maggie Heron was testifying appellant sought to elicit from her that a very severe whipping was given her by C. H. Plott, the sheriff, and several other officers; that this occurred in the early morning about 2 o'clock, and that the whipping continued until the time the meat wagons began to move from the markets to deliver meat to customers. It ceased because the officers were afraid her screams would attract attention. She was very severely whipped. She was defendant's witness, and placed in jail without process. This was admissible to show the condition of things and how the witness was treated, and how they were using force to make her make statements which she said were not true. It was also admissible to show the condition and environments and influences brought to bear upon the witnesses by the sheriff and those operating under and with him to affect the witnesses with reference to their testimony and to show how the witnesses were treated to make them testify, or seek to make them testify to things that were not true. It was also admissible to show the animus and feelings and interest of Plott and other officers. She was one of the most important witnesses on appellant's alibi defense. She was taken from jail into the courthouse to the county attorney's office, stripped and whipped for two or three hours, and from which whipping she was a long time recovering. This whipping was inflicted by what the witnesses term the "red heifer," a piece of leather something like two feet long and two

inches wide, and was administered on her naked skin, or as she expressed it, "whipped her on her bare hide," being held by two of the men and whipped by a third. The sheriff was standing by directing the whipping and insisting upon her making statements incriminating the defendant, which she declined. They prepared to give her a second whipping, but decided not to do so when she informed them that another such whipping would kill her. The bill further recites that it was the theory of the defendant that there was a conspiracy between Plott, the sheriff, and other officers to secure the conviction of appellant, and the whipping of these witnesses was to compel them to testify against him as the officers desired.

Frank Williams, the accomplice, testified he was whipped three or four times, and it was shown on the trial he did not implicate the defendant until after one or more of these whippings, and after it was also suggested by them to him that the defendant may have been instrumental in this murder. They also engaged in whipping another negro named Levi Jordan, who at one time the accomplice Williams said assisted him in killing deceased. The theory of defendant was that Jordan Israel and Frank Williams were testifying against him falsely through fear of Plott and the other officers, who had administered the whippings. It is also shown that the accomplice Williams at one time stated he would put anybody into the killing to stop being whipped. Mr. Plott, the sheriff, was a material witness for the State, as was Wrenn. It may also be stated that Frank Williams, the accomplice, said he shot deceased, and that Levi Jordan was with him at the time and also shot deceased. That after the whipping he implicated the defendant following a suggestion from some of the bystanders, perhaps the sheriff, that if they did the killing there was a white man, or white men, behind the move; that the negroes would not have done it of their own volition.

Another bill recites that defendant undertook to prove by Constable Wrenn the character of punishment given by himself and Sheriff Plott to Levi Jordan. The bill also shows that appellant and the accomplice, Williams, were brought face to face in jail after the murder and Williams stated that defendant was not connected with the murder. He stated that he and the negro Levi Jordan did the killing of deceased, St. Clair, and that Jordan got deceased's watch, and they divided the money, he, Williams, taking $35 and Jordan $36 and the watch. It is also shown that Plott and other officers brought before Frank Williams the negro Levi Jordan, in the Marlin jail, and in the presence of the witness Reed; that Plott then said: "Some white man got you all into this thing. You had better come clean and tell the truth and some white man was responsible for it, that they were not responsible." Reed also said when they began to strip the negro he left as he did not care to see the whipping. The defendant also offered to prove by Constable Wrenn what was then done to the negro Levi Jordan by himself and

Plott, in administering this whipping. The court refused to admit this testimony. Wrenn would have stated, had he been permitted, as follows: "Myself and C. H. Plott whipped the negro with a leather strap, we didn't whip him steadily but would give him a few licks and talk to him, and then hit him some more, and after we finished whipping him we put him in a bath tub nearly full of water, and would stick his head under the water every now and then. We whipped him again the next day." This record is full of testimony with reference to these various whippings and the severe manner in which they were administered to these negroes. These witnesses under these thrashings and beatings changed their statements time and again until finally they connected appellant with the homicide, and on the trial so testified. This testimony was material and important, bearing upon the whole conduct of the officers and the manner of getting testimony, and directly upon the witnesses themselves who testified after being so whipped and beaten. They failed, however, with all their whipping to induce Maggie Heron to change her testimony. All details of the whippings and cruelty imposed upon these negroes are not here stated. These whippings were all admissible.

There is another bill of exceptions taken to the refusal of the court to permit Burton Ross to testify in reference to the alibi, that it would take two to two and one-half hours to ride from the scene of the homicide to where he was at work in a field, something like four miles distant from the scene of the homicide on the morning of the killing. Appellant's evidence was introduced to show his absence from the scene of the killing. It was testified that he left home, between 7 and 8 o'clock in company with Gene Marlin; that he went with Marlin to assist him in hunting cattle for Mr. Rush; that they went to the Brazos River and through pastures and fields down this river until they reached at about 10:30 what is called the Blackmon pasture, where Ross was at work; that when Marlin and appellant rode to where Ross was there was present an old gentleman named Pevy and about twenty-five or more negroes. After talking with Ross a while appellant and Marlin went across the Brazos River and from there returned, arriving at home about 12 o'clock. Appellant proposed to prove by Ross it would take these parties under the circumstances about two to two and one-half hours to make that distance on horseback. The killing occurred about 9:45 to 10 a. m. This was clearly admissible testimony, and in this connection also it was admissible in contradiction of the State's testimony introduced through Pevy, who swore he rode it in thirty-five or forty minutes, and went over the route with two other gentlemen and return in something like two hours. Ross' testimony from that viewpoint would be clearly admissible, the State having so fixed the time by Pevy that appellant might have done the shooting and reached the point where Ross was at work by 10:30. It is the universal rule that where one side places a fact before the jury, the other side has the

right to contradict it by any legitimate testimony. Ross' testimony was admissible from either standpoint. It sustained his alibi, and also directly controverted the statement of Pevy.

There are other bills of exception with regard to rulings of the court admitting and rejecting testimony, but we deem it hardly necessary to go into further detail of these matters. What has been said will give a general idea how this case should be tried with reference to the · matters mentioned. This record contains about seventy bills of exception, fully covering these matters referred to from almost every standpoint.

The charge with reference to principal is attacked, and we believe successfully. Frank Williams testified that he and defendant shot and killed deceased. After all of this testimony was in, pro and con, the impeachment and contradictions, the State relied upon the theory that defendant and Williams did the killing; that Williams shot him in his auto, and that as he was getting out of the car defendant shot him. This was the State's case in brief. Defendant's theory was alibi.

In this connection the court charged the jury on the law of principals, that if they should find, etc., that on or about the time alleged in the indictment that Frank Williams shot and killed deceased, and they should further find that the defendant was present, etc., knowing the unlawful intent of Williams, aided him or encouraged him by words or gestures in the commission of an unlawful act, in that event defendant would be a principal offender and could be prosecuted as such, and if the jury should so find from the evidence, etc., they should assess his punishment, etc. The court had charged the jury that if they should find from the evidence that defendant shot and killed deceased with a gun, they should convict him. That presented the State's theory and was based on State's facts. Appellant urged that the charge criticised was error. There was no testimony that appellant was a principal in the sense in which the criticised charge was given. The only theory of his being a principal was his presence and firing a shot. It is the rule of law that the charge should conform to the facts, and that it is error to submit any theory of the case not made by the facts which is adverse to the accused. The State's theory is that appellant and Williams each fired a shot. The defendant denied any connection with it, and proved an alibi. So there is no room from any view of this case for the charge of which complaint is made. Spivey v. State, 45 Texas Crim. Rep., 496, 77 S. W. Rep., 444; Bennett v. State, 80 Texas Crim. Rep., 652, 194 S. W. Rep., 148; Conn v. State, 11 Texas Crim. App., 390; Stewart v. State, 15 Texas Crim. App., 598; Lynch v. State, 24 Texas Crim. App., 350; Moore v. State, 33 S. W. Rep., 980; Burges v. State, 33 Texas Crim. Rep., 9.

There are many matters in the case. The bills of exception are numerous and elaborate. The record covers something like 850 pages of typewritten matter. We think, however, we have said enough with ref-

erence to the questions to let the trial court understand the theories upon which this case should be tried.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*