## J. D. Baum v. The State.

### No. 56.    Decided June 22, 1910.

### Rehearing Denied January 4, 1911.

**1.—Murder—Evidence—Motive—Malice—Acts of Third Parties.**

Where, upon trial of murder, the State, in order to show motive and malice on part of the defendant, was seeking to establish criminal intimacy between defendant and the sister of deceased and resultant enmity between defendant and deceased, there was no error in admitting testimony that after defendant had cut deceased and was followed by a State's witness with a rock in his hand, the said sister of deceased commanded witness not to throw the rock at defendant.

**2.—Same—Evidence—Motive—Defendant's Relation to Female Relative of Deceased.**

Where, upon trial of murder, the State sought to show by circumstances that for a long time before the homicide defendant had been having illicit intercourse with the sister of the deceased against the wishes of her family and the deceased, and that this was the motive for the homicide, there was no error in admitting in evidence defendant's conduct accompanied by his conversations showing the relations and intimacy between himself and said female, extending back for a period of eight years preceding the said homicide.

**3.—Same—Charge of Court—Self-Defense.**

Where, upon trial of murder, the evidence did not raise the issue of self-defense, there was no error in the court's failure to charge theron.

**4.—Same—Evidence—Confessions—Arrest.**

Where, upon trial of murder, there was no evidence that the defendant was under arrest when he made certain declarations concerning the homicide, there was no error in admitting the same in evidence.

**5.—Same—Impeaching Own Witness—Case Stated—Statutes Construed.**

Where, upon trial of murder, the State had been permitted to introduce evidence tending to prove improper relations between defendant and the sister of deceased, to show motive on the part of the defendant and thereupon introduced the said female as a witness for the State and asked her whether she had had carnal intercourse with defendant which she denied, it was permissible for the State to show that she had testified before the grand jury to the existence of such relations, in impeachment of her testimony before the trial court denying such relations. Distinguishing Skeen v. State, 51 Texas Crim. Rep., 39.

Appeal from the District Court of Erath.   Tried below before the Hon. W. J. Oxford.

Appeal from a conviction of murder in the second degree; penalty, thirty-seven years and six months imprisonment in the penitentiary.

The opinion states the case.

*Chandler & Pannill,* for appellant.—On question of admitting testimony as to declarations of sister of deceased to third party not to throw rocks:   Cases cited in opinion.

On question of admitting testimony as to conduct and conversations of defendant with reference to sister of deceased:   Gutgesell v. State, 43 S. W. Rep., 1016; Woodard v. State, 51 S. W. Rep., 1122; Gardner v. State, 55 Texas Crim. Rep., 394, 117 S. W. Rep., 148; Price v. State, 65 S. W. Rep., 909; Burnett v. State, 46 Texas Crim. Rep., 116; Spangler v. State, 55 S. W. Rep., 326; State v. Williams, 26 S. W. Rep., 339.

On question of permitting State's counsel to contradict his own witness:   Skeen v. State, 51 Texas Crim. Rep., 39; Spangler v. State, 55 S. W. Rep., 326; Ozark v. State, 51 Texas Crim. Rep., 106, 100 S. W. Rep., 929; Bennett v. State, 24 Texas Crim. App., 73; Quinn v. State, 51 Texas Crim. Rep., 155, 101 S. W. Rep., 248; Green v. State, 53 Texas Crim. Rep., 466, 110 S. W. Rep., 929; Gill v. State, 36 Texas Crim.. Rep., 589; Bailey v. State, 37 Texas Crim. Rep., 579; Largin v. State, 37 Texas Crim. Rep., 574; Irwin v. State, 32 Texas Crim. Rep., 519; Dunagain v. State, 38 Texas Crim. Rep., 614; Gibson v. State, 29 S. W. Rep., 471; Gardner v. State, 55 Texas Crim. Rep., 394, supra; State v. Williams, supra.

On question of self-defense:   Clark v. State, 56 Texas Crim. Rep., 293, 120 S. W. Rep., 179.

On question of confessions:   Jones v. State, 44 Texas Crim. Rep., 405; Nolan v. State, 9 Texas Crim. App., 419; Craig v. State, 30 Texas Crim. App., 619; Acts 30th Legislature, page 219.

*John A. Mobley,* Assistant Attorney-General, for the State.—On question of confessions:   Holmes v. State, 32 Texas Crim. Rep., 361; Brewer v. State, 32 Texas Crim. Rep., 74; Lopez v. State, 37 Texas Crim. Rep., 649; Craig v. State, 30 Texas Crim. App., 619.

On question of showing motive by defendant's conduct and declarations concerning sister of deceased:   Russell v. State, 11 Texas Crim.

App., 288; Rucher v. State, 7 Texas Crim. App., 549; Dill v. State, 1 Texas Crim. App., 278; Blackwell v. State, 29 Texas Crim. App., 194; Leeper v. State, 29 Texas Crim. App., 63; Welhousen v. State, 30 Texas Crim. App., 623.

On question of State contradicting its own witness: We earnestly urge that the State not only had the right to examine the witness under such state of facts with reference to her former statement, but that it had the right to introduce the statement itself in evidence before the jury under the circumstances detailed in the bill. It will be conceded, of course, that if the statement itself would have been admissible, then the questions asked and their answers were likewise admissible in proof. This contention of the State that such evidence was admissible is based upon the common law rule of evidence upon the subject, and upon article 795 of our Code of Criminal Procedure (art. 755, old Code).

The theory of the prosecution in the case at bar was that the homicide was committed in consequence of the acts of intercourse between the appellant and Mary Watson. She testified that the acts of intercourse did not occur. This was adverse to the theory of the prosecution and was most certainly "injurious" to it. It disproved, if true, a material contention of the State. It was a direct denial of the truth of one of its important contentions and that by a witness who knew about it. If she had simply failed to reaffirm her former testimony, had declined to answer questions, or if she had answered that she did not know, in such event, she would not have given testimony injurious to the cause of the State, and the prosecution would not have had the right to prove her former statement that the appellant had had intercourse with her. But she did not decline to answer. She did not merely fail and refuse to reaffirm her former testimony. Her evidence was in effect that an important theory of the prosecution was wholly without foundation, and that the evidence theretofore offered by the State to establish this important and material fact of its case was untrue. Young v. State, 44 S. W. Rep., 835; Kirk v. State, 35 Texas Crim. Rep., 224; White v. State, 62 S. W. Rep., 749; Jeter v. State, 52 Texas Crim. Rep., 212; Blake v. State, 38 Texas Crim. Rep., 377, and cases cited in opinion.

If the State was not authorized to impeach her, then it was bound by her answer. Was it so bound? Of course not, and the court can not so hold. If this were true, then the State was forced to sacrifice without fault of her counsel an important and material theory of its case through the trickery of a witness whose opposition was first made manifest while upon the witness stand.

It is believed that the only condition under which the State can not impeach its own witness, when the witness has made a damaging or hurtful statement upon the stand to the surprise of State's counsel, is in a case in which there is no other evidence of incriminative matter contained in the impeaching statement. In this event there

is, of course, no reason and no justification for the introduction of the impeaching testimony. If the adverse statement of the witness be contradicted the matter is still left without proof to support it. But in the case at bar there was other evidence of the fact of the intercourse. The case of Largin v. State, 37 Texas Crim. Rep., 574, is such a case.

Suppose A spends the night with B in the latter's room. There is a crime committed, say, at 10 o'clock at a point of easy access to B's room. B goes before the grand jury and testifies to the fact that A spent the night with him in his room; that A left his room at 9:30 and returned at 10:30. He signs a statement to this effect. The circumstances in evidence point to A's guilt. Upon his trial the State introduces B as a witness and by him proves that fact that A! was spending with him in his room the night upon which the crime was committed. He is then asked to state whether or not A left his room. He answers, "A did not leave my room at all that night." Would not the State be entitled to introduce in proof his former contradictory statement? If not, it would be bound by his answer. Note, too, that this is an affirmative statement of a negative fact just as is the statement of Mary Watson in the case at bar. Would not B's answer be injurious to the cause of the State within the meaning of the language of article 795 above referred to? Again, A, B and C are standing together in conversation. C is killed. The circumstances indicate A's guilt. B goes before the grand jury and testifies to the fact of his presence and his opportunity of knowledge of A's actions. He testifies that A pulled a pistol and shot C with it. Upon A's trial the State introduces B, and after proving by him that he was present and his opportunity of knowledge of A's conduct and actions, he is then asked to state A's connection with the homicide, if any. He answers that A did not fire a shot. This, too, is an affirmative statement of a negative fact. It destroys the State's case and is certainly injurious to its cause. Could not the State, if it had other testimony in the trial tending to establish A's guilt, upon showing its surprise and good faith, introduce the contrary statement theretofore made by B? If it could, then the judgment of the trial court in the case at bar ought to be affirmed. Take another illustration: A homicide is committed at a given hour in the city of Austin. Circumstances tend to show that the crime was committed by A. B, a witness before the grand jury, testifies that he saw A about the hour of the homicide near the scene of the killing. A denies his presence. Upon A's trial the State, relying upon B's evidence, as given before the grand jury, introduces him as a witness. If B thereupon testifies that he did not see A in Austin at the time of the homicide, the State can not introduce his former contradictory statement, because the fact that he did not see A does not disprove A's presence. This would be merely a failure of proof. But if he

go further and testify not only that he did not see A in Austin at the hour mentioned, but that at said time he saw him in Houston, his testimony would be injurious to the State, of course, and the State would thereupon be entitled to show his grand jury statement to impeach him. Such evidence would in effect be that A was not in Austin at the time of the homicide. In what respect does this differ from the case at bar? Cases above cited.

COBB, Special Judge.—Appellant was indicted January 4, 1909, for the murder of Edgar Watson, and tried and convicted on the twenty-first of murder in the second degree, and he has brought his case before this court and here seeks a reversal upon the grounds herein considered.

That the court permitted the State to prove by Tom Knight that after appellant had cut deceased and was being followed by witness with a rock, Mary Watson commanded witness not to throw the rock "in here," but to throw it down, defendant's objection being that this remark of Mary was irrelevant and the declaration of a bystander, and took his bill. The court in explanation of the bill shows that defendant had just cut Knight's hand and was following him with a knife, that he considered it res gestae. He also states that the State contended that there had been illicit relations between defendant and Mary, and that the other members of the family, including deceased, opposed his course with Mary, and defendant held malice against them on that account, and further that she was standing by the defendant when she spoke the above words to Knight. We do not believe it was res gestae. Ex parte Kennedy v. State, 57 S. W. Rep., 648; Felder v. State, 23 Texas Crim. App., 477, 5 S. W. Rep., 145; Holt v. State, 9 Texas Crim. App., 571. Was it admissible because the State was seeking to establish criminal intimacy between Mary and defendant and resultant enmity between defendant and her family, and that she was friendly towards defendant? We think so; and as the same matter as herein involved is set out in bills of exception Nos. 3, 4, 5, 6 and 8 relative to the admission of testimony tending to show undue intimacy between appellant and said Mary, we deem it well to set out at some length the State's testimony showing the circumstances of the homicide, and the conduct of appellant with the said Mary, all the latter being at the time excepted to as shown in the record.

The facts are rather voluminous, but, in substance, the witnesses state that on the night preceding the 25th of December, which was the day of the homicide, appellant, his wife and a five year old daughter spent the night with W. A. Daugherty. On the evening preceding the 25th of December, or Christmas Eve, there was a Christmas tree at the residence of Mrs. Frankie Watson, who was the mother-in-law of appellant. The family of Mrs. Watson, children and grandchildren had gathered from different sections to spend

Christmas with their mother and grandmother. The house being overcrowded, appellant and his wife, daughter of Mrs. Watson, and their little child spent the night with Daugherty. The next day Daugherty and his family and appellant and his wife and child returned to Mrs. Watson's residence to enjoy a Christmas dinner, with the remainder of the family and friends. There were quite a number of these. The witness Daugherty testified, in substance, that he and appellant had taken two or three drinks before going over to the residence of Mrs. Watson. There had been some target shooting in Mrs. Watson's yard, in which several of those present engaged. Deceased was in the house playing an organ at the time that Daugherty went into the residence from the yard. While Daugherty was sitting in the room appellant came in and began talking to Mrs. Jennie Watson, his sister-in-law. He asked Jennie Watson if he had hurt her feelings. She replied, "No, my feelings are not hurt." After this Mrs. Jennie Watson went out of the room, and appellant's wife came in and talked to appellant. His wife said to him, "There is nobody mad at you, J. D." (meaning defendant). Appellant replied: "I thought you said the whole damned push was going to get on me?" She said to him: "No, I didn't say that; but if you keep on you will have them mad at you." Appellant then said: "All right," and turned and started towards the door where witness was. Witness got up and started towards the south door, going out on the porch. Before this witness passed out the door deceased came in at the east door, and when just inside the door said to appellant: "J. D., there is nobody mad; all we want is for you to keep quiet." Appellant then turned and raised his right hand, and said to deceased: "Damn you, make me do it." At that time they were out of the witness' sight. This witness did not see the encounter but described the wounds. This witness also says as far as he could observe appellant up to the time of the conversation detailed was in a pleasant humor with everybody. Mrs. Jennie Watson testified in regard to the family reunion, and said that on the morning just preceding the difficulty she was in the dining-room of her mother-in-law's, Mrs. Watson, preparing the dining-table for the Christmas dinner, when she heard her little boy, about five years of age, crying somewhere about the place and heard defendant talking to him, but did not hear anything he said. Just after this appellant came into the dining-room where she was standing and asked her if she was mad, saying to her: "Jennie, are you mad?" She replied: "No, J. D." Appellant then said: "Not a bit?" and witness replied: "No, not a bit; I never thought about being mad." Then he remarked: "Addie (meaning his wife) says the whole push of you are mad at me." Witness says he then commenced walking the floor, and said: "Just any of you get on me—all of you, every God-damned one of you;" and about that time Edgar Watson, deceased, came to the door and said: "J. D., nobody is mad at you, and you will have to

stop that." Appellant then said: "God-damn you, make me do it," and struck him with a knife. Witness states appellant had the knife in his hand when he first came into the room and began talking to her. The witness went into a detailed statement of the incidents of the transaction, which we deem unnecessary to collate. On cross-examination, in regard to some of the matters, she said when she heard the child cry she did not look around or quit her work, and in fact paid no attention to the matter. She says: "It seemed to me that the defendant was carrying the child about in some way, and he always seemed to be fond of children and would play with them. It was only a little time after I heard the child crying that defendant came into the dining-room and spoke to me, as before stated. There were quite a number of people in the dining-room at the time. Deceased, however, was in another room somewhere, as was defendant's wife." Tom Knight testified that he was the son-in-law of Mrs. Frankie Watson, and brother-in-law of appellant and of deceased, and lived in Collin County, and was at the home of his mother-in-law with his wife and little baby on the day mentioned, December 25, the day of the homicide, and was there on the place at the time of the homicide. That appellant and his wife and child had also come the evening before about dark, and remained until after supper and until the Christmas tree exercises were over. On this Christmas eve Mary Watson, daughter of Mrs. Frankie Watson, came with appellant and his wife. Mary Watson was the sister of appellant's wife and sister of the deceased and of Mrs. Knight. Just before this difficulty this witness says the first he saw of appellant was on the porch where they had a target rifle. Something was said about a target gun that appellant had previously fixed for Oscar Watson, a younger brother of deceased. Appellant remarked to Oscar: "Kid, you owe me" or, "You still owe me two dollars for fixing that gun," and just laughed, and said: "I can beat you shooting this gun." They then went outside and began shooting. Witness then left them and went back into the house, remarking, "I will go back in the house;' you have beat me shooting." He went to the south room of the house where he saw Edgar Watson, deceased, playing a harp. Directly appellant came in, while witness was playing a harp and deceased was playing a guitar. Witness handed appellant the harp and he began playing, and played two or three pieces. Witness then left this room and went into the dining-room and sat by the fire, nursing his baby, who was sick, or had been sick. Appellant came into the dining-room and got to playing with one of the children, and was also scuffling or playing with Mrs. Ford. He also played with Mrs. Jennie Watson's little child which was crying, and after-wards he went out of the door on the east side of the room. Appellant's wife went out also and told him to let the child alone. Appellant then came back into the dining-room and walked to where Mrs. Jennie Watson was standing at the table, and said to her: "Jennie,

did I make you mad by playing with your baby?" She replied:
"No, J. D., you didn't make me mad." Appellant then said: "Well,
my wife said the whole God-damned push was going to get on me;
and now I am inviting the whole God-damned push to get on me."
His wife came in at the time and said: "No, J. D., I didn't say
the whole push was going to get on you; I said you were going to
make some of them mad." Deceased stepped in at that time, and
while appellant was walking backward and forward in the room, de-
ceased stepped just inside and said: "J. D., there is nobody mad at
you, and all that we ask is that you be quiet and behave yourself."
When this remark was made appellant started towards deceased, say-
ing: "Make me, make me," and when he got within reach of deceased
cut him with a knife. Witness went into detail in regard to the
matter, and the evidence shows that deceased was cut twice with a
knife, once on the side of his face, commencing about an inch and a
half above the ear and extending down across the cheek and jaw, and
on down the neck, stopping about two inches below the jaw; and the
other wound was in the right side, severing the first rib from the
breast bone. The witness Howard testified that he lived near the
place where the killing occurred. That some time between 11 and
12 o'clock he saw appellant about seventy-five yards from his house,
coming from the direction of Mrs. Watson's residence. Witness went
to where appellant was, when this conversation occurred: "When I
met defendant I asked him, 'What in the world is the matter, Baum?'
He said to me: 'I have cut everything that came before me; I guess
I have done the deed that will cost my life.' From this I asked:
'Are you drunk, Baum?' With his arms around his little child, which
he was carrying, appellant said: 'Do I look like a drunk man?' I
said to him then: 'It looks like it would take a drunk man to do
this deed.' He then said: 'I have done it, but I done it in self-
defense, and it has been on hand eight years.' I then asked him
where he was going, and he said: 'I am going to surrender to the
officers.'" The balance of the conversation between them perhaps
is unnecessary to be stated. Mary Watson testified that on the morn-
ing of the homicide appellant came from Mr. Daugherty's, where he
had spent the night. That she was not with appellant at all that
day up to the time of the difficulty, but that he came into the kitchen
where they were all preparing dinner and said to her mother that he
wanted to kill her hogs for her, and afterwards came into the dining-
room and asked Wiley Watson's wife if she was mad at him, and she
told him she was not mad. Appellant then remarked that he under-
stood his wife to say that the whole bunch was going to get on him.
Witness did not hear anything else that was said that she could
remember. Appellant then walked up and down the floor and begged
them all to get on him. Witness did not recollect what he said. Her
brother, Edgar Watson, came just inside the door while appellant
was walking up and down, and said to appellant that nobody was

mad at him; that he must keep quiet. Appellant then said: "You make me." She did not recollect hearing him use an oath. Appellant and deceased went to fighting. She says she saw him strike at deceased, but did not know whether he hit him or not. She did not see anything in appellant's hand at the time he struck at her brother. They went back out of the dining-room, deceased was backing away and appellant following him. They went in the hall. Witness followed them and pulled someone off, but did not remember who it was. She says she saw Tom Knight in the hall with a rock in his hand. That she had gone in the hall ahead of appellant, and he came on immediately after she did, and stopped a minute, and she turned and asked him what he had done, and he said he did not know. That was all she heard him say before he went out of the door and started across the field. She testified, in substance, that she had lived most of the time with appellant and his wife after their marriage. Mrs. Frankie Watson testified as to her relations with the parties, and as to her children married and unmarried. That at the time appellant and his wife were married Mary Watson was sixteen years of age, and was twenty-four years of age at time of difficulty and unmarried. That about eight years before she was testifying there had been some trouble between herself and appellant in regard to her daughter Mary; that they "had a little jowering about it." That appellant and his wife were living close by her residence and frequently visited them. That appellant would come himself and talk with Mary a year or so after appellant and his wife were married. At one time he came from Stephenville and stopped at the house a little after dark, and called Mary out to the porch. He was at that time sitting on his horse. Witness stepped to the window, and she says appellant gave her a hard look and then rode off pretty fast. She did not hear anything that was said to her daughter, but only that he wanted to talk to her. That he went off rapidly towards home, and subsequently returned, and came in the house and opened a spring-back knife, and wanted them to keep quiet. That her daughter, Mrs. Ford, Mary, Edgar and Oscar were all in the house with her at the time. That appellant wanted to know why Mary was not at his house, and was talking to her about it. Here Edgar Watson stepped back to a target gun in the room, and appellant told him he didn't have nerve to use it. That appellant then stepped out on the porch, or somewhere about there, and said he wanted the gun to use for himself, that he did not aim to harm any of them, and then went to the mantel and commenced looking for cartridges, but Mrs. Ford had got and taken charge of them. Appellant said he was looking for them to defend himself, or use on himself, that she did not remember which. Witness told appellant that he had better go home, that his wife was looking for him, and he said he did not know whether he would see her that night or not. After that he went out, and there was a light in his home a few

minutes later. Witness says she told appellant that she thought she had the right to look after her daughter's conduct. At another time, she testified, appellant came to the house, and he and Mary were in the northeast room of the house talking. That he did not stay there long; that he came out and went on home, and Mary came out of the room combing her hair. That she saw them through the door, but they did not see her. That Mary was sitting at the organ and appellant was standing nearby.

Bills of exception 3, 4, 5, and 6 show the admission of the following testimony: That about eight years before the homicide appellant and Mrs. Watson, mother of deceased, had trouble about Mary, and a little jowering about it. One time appellant, coming from Stephenville, stopped at her house and called Mary out, and when Mrs. Watson stepped out appellant gave her a hard look and rode off. Near the same time appellant was at Mrs. Watson's and he opened a knife and told them to keep quiet, she, her daughters, Mrs. Ford and Mary and deceased being present. Appellant asked why Mary was not at his house, and talked to Mrs. Watson about it. Deceased stepped to a target gun and appellant told him he did not have nerve to use it, and went out on the porch and said he wanted the gun to use for himself, that he did not aim to harm any of them. He then began looking for cartridges, but Mrs. Ford had put them in her pocket. He said he wanted them to use on himself or defend himself. Mrs. Watson told him he had better go on to his wife. He said he did not know that his wife would see him that night, but there was a light in his house shortly after he left. Mrs. Watson told him on that occasion that she had the right to look after Mary's conduct. About a year later appellant was in Mrs. Watson's house in a room with Mary talking, she sitting by the organ and he standing near. After he left Mary came out combing her hair, and later went to his house, and they together returned to Mrs. Watson's, who told appellant he ought not to be talking with Mary that way, and that she did not think he was treating her, Mrs. Watson, right. Another time the matter came up between Mrs. Watson and appellant about Mary; that was when they moved to the three-circle ranch three or four years after the first trouble, and when Mary went off with appellant and his wife, Mrs. Watson wanting Mary to come home, which she would not do. Appellant told Mrs. Watson Mary was of age and could do as she pleased, and not to lay hands on her. Mrs. Watson told Mary she would make her go home, and told appellant she felt like hitting him, and he said he did not take that off of his own folks, let alone her. Mary stayed at appellant's till they moved, went by her mother's and got her things, went off, and was gone seven or eight months. They left in December, and Mary did not come back before August, and stayed a day and night and then went back with her sister, Mrs. Baum. In the winter they moved to Stephenville, and Mary with them, and she remained with them,

making one or two trips home, until the day before Christmas, when she and appellant and his wife came to Mrs. Watson.

The court, in modifying the bills, says Edgar was the oldest male in the family, being thirteen at the time of the first trouble. Mary was appellant's sister-in-law. Appellant had told Howard, witness, that "it had been on hand about eight years." The State tried to show by circumstances that for eight years appellant had been having intercourse with Mary against her wishes and deceased, and that this was the motive for the homicide, and that the court thought the testimony admissible on motive and malice, and as a threat against deceased, and as tending to show an effort to intimidate him, and that Mary testified that on one of the occasions appellant was kissing her and had often hugged and kissed her, and that she had told appellant of her mother getting after her about it, and he said he would go and see her about it. The court further says there was no evidence to show any trouble between appellant and the Watson family except that on account of his conduct with Mary, which her mother testified began about eight years before the homicide.

It thus seems that shortly after appellant married Mary's sister, Mary, with an occasional visit home, lived at his house; that he sought her company; that she preferred living at his house; that he kissed and hugged her, which is not proper in a brother-in-law when done privately. It seems also that the conduct detailed made Mrs. Watson suspect something worse and began a strained, if not hostile, relation between her and Baum, of which Baum knew, and that the boy Edgar was aware of most of it. He is not shown by this testimony to have known of the hugging and kissing, but evidently knew of Mary's absence from home. From Mary's testimony adduced later we judge that Edgar must have suspected that she and appellant were guilty of extreme indiscretion, if not actual criminality, and that appellant was made aware of such suspicions. The conduct of appellant with Mary, beginning shortly after his marriage, continued until a few days before the homicide. If a man actually debauches his wife's sister, a young girl, and continue his relations with her, taking, or at least keeping, her from her home to live at his house, resents remonstrances of her mother, makes sneering remarks about the oldest brother, calling him just a boy when made aware that he is offended at his course, and shows contempt for her whole family by assuring the corrupted female that she was as good as the balance of them, ought not the State be allowed to show up his conduct when he, on a peaceable, festive occasion, in the presence of all the family, without any reason, assaults with a deadly weapon and slays the brother of his wife, who has done no act and said no word except to ask him to keep quiet, after he, imagining, without any cause apparent from the surroundings, that the whole push was mad at him, challenges them to get on him? We think so. In the case of Weaver v. State, 43 Texas Crim. Rep., 340, 65 S. W. Rep., 534, defendant had sus-

tained illicit relations with the wife of deceased two years before the homicide, and before her marriage, and the evidence of such relation was by this court held admissible to show motive. We understand that evidence of other offenses or misconduct of a defendant toward or with other parties is generally not admissible. Woodard v. State, 51 S. W. Rep., 1112. And that there should be some evidence to warrant a reasonable inference that the motive sought to be drawn from the conduct of a defendant was so proximately related to the act of the homicide to justify the conclusion that it was in whole or in part the moving cause of the act. Circumstances may be sufficient to establish such relation, and when it exists up to the very time of the homicide, slight circumstances may be sufficient. See Price v. State, 65 S. W. Rep., 909. Where it was shown that at the time of the homicide defendant was living in adultery with· deceased's wife, but there was no evidence that deceased complained or accused defendant of it, and the court says: "This testimony was not admissible as there is nothing tending to show any connection whatever of the adultery with the killing, but the record shows that the killing grew out of a separate, distinct and independent motive." Here the record is silent as to motive other than the one suggested by the testimony, unless we suppose that diabolical disposition in appellant, which is refuted by the proof of good reputation, would lead him to kill upon apparently mild and respectful admonition of deceased: "We are none of us mad with you, but you must keep quiet." Were these such words of provocation as would lead to murder? Is it not rather the cherished resentment long gendering in his heart that finds vent in so trivial a circumstance and leads him, while all others were assuring him of their goodwill and peaceful inclination, to assume hostility in them all, and to put out of the way the oldest son of the family as the one most likely some time to call him to account for his misdeeds? But suppose appellant and Mary were innocent of wrong, and that he was angry at or imbittered toward her brother for his insinuations against her virtue. Would not the matter of his whole relation with Mary and the manner it was looked upon by her family be pertinent?

In bill 8 appellant complains of the testimony of Mary Watson to the effect that appellant kissed her at her mother's house when the latter saw them in the room, the objection being that it was irrelevant, calculated to prejudice and inflame the jury, and to convict him of improper relations with Mary; that the deceased was not present nor shown to have heard of the circumstances, and that it was not the moving cause of the homicide, and was not mentioned at the time and threw no light on the issues. The court explains his reasons for the admission of the evidence by reference to modifications to bill 6 recited above. For reasons therein and above in discussion of former bills shown we overrule all the objections stated in these bills.

In bill 9 appellant summarizes the testimony of Mary Watson,

which we condense. She said Edgar had never accused her of improper conduct with appellant; that she had not told Edgar of such things; that she had told appellant what Edgar said to her, and appellant said it made no difference, that Edgar was but a boy; that she did not remember testifying before the grand jury that Edgar had made such accusations against her, and that she had told appellant of it. She stated she had told appellant that her family had accused her of improper relations with him, but did not remember what he then said or his manner or his humor about it or whether he said "Let them talk and rear," or "It did not make any difference" or that "She was as good as the rest of them." She said she believed that he said she was as good as any of them, and that it made no difference, that Edgar was but a boy and was repeating what others said. She further said that she and appellant had not had carnal intercourse; that she did not remember making the written statement then shown her before the grand jury in which she had testified to carnal intercourse with appellant, but remembered testifying before the grand jury. She did not remember testifying before the grand jury to appellant's having intercourse with her in the yard before they went to the ranch. She said it was not a fact that she had such intercourse at the ranch, nor at Stephenville, nor the day before Christmas. She was then shown the statement and asked to read it, and said she did not remember that it was read to her before she signed it, and did not remember that the county attorney was in the grand jury room, nor a Mr. Stigler, who was pointed out to her in the courtroom. Being asked if the statements in said statement that she had intercourse with appellant were true, she said they were not. She said she did not remember whether appellant's wife went to the stores Christmas Eve, nor whether she and appellant and his child were then left together; that she was at appellant's Christmas Eve, and went with him and his wife and child to her mother's that evening. She said it was not a fact that she had intercourse with appellant that evening; that she did not remember telling the grand jury that she did, nor whether they questioned her about it, nor remember telling that an abortion had been practiced upon her. The State's attorney then went close to the witness and began reading the statement to her in a tone the jury could not hear, but the judge stopped him. During all this examination the State's attorney had in his hand the grand jury statement and spoke of it as such. The court certifies that in the conversations immediately preceding the homicide and at the time thereof defendant's relationship to Mary was not mentioned, and that such relationship was not shown by the evidence to have been discussed between appellant and deceased. Appellant's objections to Mary's testimony and exhibitions of the grand jury statement before the jury were that they were irrelevant, immaterial, amounted to an attempt to impeach the State's own witness; and to get in before the jury here statements

before the grand jury showing what she had said before the grand jury, and proving by independent evidence other offenses; and further, that the matters inquired about were not shown to have been the moving cause of the homicide, never mentioned between appellant and deceased; that her declarations before the grand jury could not bind appellant, and that the conduct of the State's attorney in questioning her was calculated to convince the jury that Mary and appellant were guilty of adultery, while she all the time denied it, and that such conduct was prejudicial. The court qualifies the bill and explains his reasons for permitting this character of examination by saying, "The witness appeared to be hostile to the State and to be in the interest of the defendant, reluctant and unwilling to testify, and that it had been shown that she had for some years lived with defendant, and that she was by his side at the time of the difficulty, and had told Knight not to throw the rock, though defendant had just killed her brother, and was then after Knight. No grand jury statement of the witness was admitted in evidence. She was simply asked by way of refreshing her memory if she made certain statements, and she denied it outright, or that she did not remember." We are sure a party, who introduces a witness by whom he has reason to expect he can prove a fact material to his case, has the right, in the event the witness testifies to facts adverse to his case, to show the prior statement of the witness favorable to his case so that he shall not be destroyed by the treachery of his own witness. Code Crim. Procedure, art. 755. When the witness, whether he is lying before the trial court or had formerly lied, testifies to no fact adverse to the case of the party introducing him, but merely fails to remember what he formerly said or to affirmatively support the case of the party introducing him, and being asked whether if he made such statements they were true, answers that they were not true, how much further may the party go? Can he display a paper containing the former statements, and by obtaining the witness' admission that he signed it and framing questions from its contents such as, "Did you make this statement in this paper?" using the very words of the statement, and thus get before the jury not only the fact that the statement had been made, but also the sum and substance of its contents as fully to all practical intents as though the statement had been read to the jury. If the paper had been formerly offered, the judge would no doubt have excluded it on the ground that the witness had not testified to any fact against the State. It is an axiom in mathematics that things equal to the same thing are equal to each other. Does it not look like holding to the mere semblance and shadow of the rule to say that while the paper was not read and could not be read before the jury, that the fact that witness did make the statement and all the contents thereof should be and was shown by this display before the jury and by questions drawn from it and by imputing to witness statements therein in the very form of the ques-

tion? Her testimony contained in the paper that she and defendant had not had intercourse was not evidence against the State and for defendant. It was simply 'a failure to testify for the State and did not authorize her contradiction by proof of her statements given before the grand jury. White v. State, 10 Texas Crim. App., 381, and Bennett v. State, 24 Texas Crim. App., 73. In Storms case, 37 S. W. Rep., 439, for cattle theft, the owner of the cattle testified before the grand jury that one Rice told him in defendant's presence that defendant had given the cattle to him, Rice, and that defendant said, yes, but it was by mistake. On the trial the witness testified not only that defendant did not say what he, witness, had said he did before the grand jury, but that Rice stated that he, Rice, took the cattle through mistake. The testimony was held admissible. And in the case of Williford v. State, 36 Texas Crim. Rep., 414, 37 S. W. Rep., 761, speaking with reference to this matter, it is said: "If the State's witness denied that defendant made the statement (which, if made, was evidence against him) the State's investigation was at an end, and it could not prove by other witnesses that the witness being examined had made the statement. If she had gone farther and testified to an affirmative declaration of defendant hurtful to the State, then and then only could the State prove her declaration previously made and favorable to the State." We think the proper practice where the matter desired to be used to refresh the memory of the witness is in writing, is to submit the writing to the witness and inquire whether the statement therein is true, and should the witness deny it, there is no occasion to further question him, for if his memory is not refreshed by a reading of the statement, no further purpose other than to get the statement before the jury could be served by putting its contents into questions. 1 Greenlf. on Ev., sec. 463. "Counsel will not be permitted to represent in the statement of a question the contents of a letter, for the contents of every written paper, according to well established rules of evidence, are to be proved by the paper itself and by that alone." Sec. 465; see also secs. 443 and 444 and notes.

These authorities recognize that prosecuting attorneys who fail to elicit expected testimony from a witness may try to recall a former statement and correct the evidence and afford him an opportunity to correct his evidence if he will and show the attitude of the party offering the witness, but if the object be the discredit of the witness, the examination ought not to be allowed. Was it not evident that when Mary had flatly and unequivocally denied the intercourse, that the parading of the grand jury statements and putting its whole contents before the jury in questions manifestly was not to refresh her memory, but rather to discredit her testimony denying the intercourse and thereby make the jury believe, despite her denial, that the relation existed, and what other effect on the jury could it be imagined such course would produce? In Ozark v. State, 100 S. W.

Rep., 927, it is held that where a witness for the State had testified nothing against the State, it was improper for the district attorney to ask him questions as to contradictory statements and then prove by other witnesses that he made the statements. Now, in this matter, the written statement which the prosecuting attorney had in his hand he showed to the jury, and the contents of it he fully disclosed to the jury as we infer from the record, and in our opinion he has as clearly violated the rule as though he had produced a living witness to impeach his own witness, when she had done nothing more than fail to testify what he expected her to testify.

Under the state of testimony it does not appear that appellant was arrested by Howard, and we therefore think that his statements to Howard, set out in appellant's bill No. 7, were properly admitted in evidence.

The testimony does not, in our opinion, disclose or suggest self-defense. As now presented, it shows that appellant began the fight upon no other provocation from deceased than his simple statement that the family was not mad with appellant, and that he must keep quiet. Deceased made no hostile demonstration until he had received the mortal stroke from appellant's knife. The most favorable testimony on this point is that of Mary Watson, who says they went to fighting, but does not contradict the positive testimony of the other witnesses that defendant struck first after advancing on deceased. The statement of appellant to Howard that it was in self-defense is not, in our opinion, under all the circumstances, entitled to be recognized as a statement of fact or a circumstance sufficient to throw any doubt upon the positive testimony of the State as to the manner in which the difficulty began.

For the error pointed out, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

McCord, Judge, not sitting.

RAMSEY, JUDGE (dissenting).—I most respectfully dissent from the conclusion reached by the majority of the court. I fully endorse and approve the opinion except on the sole question on which the case is reversed. I am not sure but that the court would have been authorized to permit contradictions of Mary Watson. However this may be, I do not think there was any such abuse of the discretion wisely committed to the trial court in her examination as ought to work a reversal of the judgment of conviction. I may at some future time, during vacation, write my views at length.

### ON REHEARING.

#### December 8, 1910.

COBB, SPECIAL JUDGE.—The State's motion for rehearing invites

a review of many of the cases wherein art. 755, Code Crim. Proc., has received or been denied application. The article as here involved may be paraphrased thus: A party may prove the prior contrary statement of a witness in impeachment of his *testimony* when he testifies to a fact injurious to the cause of such party. No opinion of this court has attempted an analysis or definition of the phrase "a fact injurious to his cause." These questions arise in an endeavor at construction. Does the word "cause" mean *merely* the case made by the pleading and relate *only* to the issuable facts arising therefrom, or the facts that *must* be proved to entitle the party to judgment? Second, do the words mean that the party must have first made out by evidence a prima facie case before a witness can be deemed to testify to a fact injurious to his cause? Third, is the statute so broad as to cover all relevant testimony, though collateral to the *issuable* facts? Fourth, is it intended that the party may impeach his witness whenever he contradicts other witnesses on whose testimony the party bases a theory of his case? The adjudged cases make it clear that a party may question his witness as to former favorable statements when he has unexpectedly denied the statements, and yet not have the right to impeach him. If the testimony be *merely* negative and is not in its effect equal to the *affirmation* of a fact *favorable* to the adverse party, the party introducing him can go no further than—if he may—refresh his memory and get from him a retraction or modification of his testimony; but when the witness goes over to the enemy and affirms a fact destructive in whole or in part of the cause of the party introducing him, he, being no longer his witness as to such a fact, may be attacked in any way and by all means, except that of proof of reputation. Is he such an enemy when he refuses to sustain the party's cause by denying an affirmative such party seeks to establish and asserting the negative of the fact? If the fact involved is, if true, known to the witness, is his denial for that reason any the more open to impeachment? If the fact could not be without his knowledge his denial of knowledge is certainly equivalent to a denial of the fact, unless he take refuge behind a bad memory. If A assert that B shot *him* and later testify that it was C and not B, B being on trial for the assault, the evidence is both injurious to the State and favorable to B; but if he assert that B was his enemy and testify that B was not his enemy he could not be impeached by proof of the assertion, unless it be shown that the assault grew out of or was induced by the enmity. If the enmity be related to the assault as a procuring cause it would be relevant to a fact in the case, collateral to the elemental facts of the case, yet admissible in chief. Is it testifying to facts injurious to the State's cause if in such case A denies that B was his enemy? He thereby, insofar as believed, destroys the *theory* of the State as to motive or moving cause for the assault, but neither the intent nor the character of the act is in any degree questioned by such proof.

This discussion is not intended to raise a question not made by appellant, but to discover, if possible, the sense of the statute.

It is urged in the motion that the court erred in holding that Mary Watson should not have been subjected to the examination complained of by appellant, she being a State's witness. Upon a careful review of the record, with examination of the authorities, the majority of the court, while not approving the manner of examination, have concluded that, since the State was, as we held, properly allowed to offer evidence tending to prove improper relations between appellant and the witness, and had, before introducing her, made some proof of such fact, it was permissible for the State to show that she had testified before the grand jury to the existence of such relations in impeachment of her testimony before the trial court denying the relations. While the matter of their relation was in a sense collateral to the issue in the case, it was yet relevant to the matter of motive, or to put it otherwise, original evidence for the State as held in many cases by this court and not collateral in the sense that it affected the witness only and not the case. If then the State could properly prove the fact and thereby account for the motive on appellant's part and had made some proof of the fact, such fact had become practically a part of its cause. Hence, it would be injurious to the State's cause to disprove this fact from which motive could be deduced. Countervailing testimony from a State's witness may be said to be injurious to the State's cause when it involves matter relevant to the State's case as made in the pleading and sustained by the testimony. If the State has offered no evidence to prove a relevant fact, it can not be said that its witness who denies the existence of such relevant fact has by such denial injured the State's case. If, for instance, in theft, the *nonconsent* of the owner has not been proved, owner's denial of his *nonconsent* or *assertion* that he *did consent* could not injure the State's case, and the fact that he had elsewhere stated or sworn to his nonconsent would not be provable. If the fact of illicit relation between appellant and Mary affected only her credit as a witness and was not a substantive relevant fact provable by the State as a part of its cause, such fact ought not to be shown by the State when denied by her. If the fact of intimacy was relevant to any issue raised under the charge of murder and plea of not guilty, the State had the right to prove it, and such fact, after the State had adduced evidence tending to prove it, was no longer a fact going merely to the credit of the witness, but became a fact in the State's case and the State's case would, therefore, be injured by its witness if such witness should testify that the fact did not exist. The difficulty in the situation is that witness did not affirm anything, but stopped at a mere denial, and if we do not keep in mind the relation of the witness to the fact; that is, that it could not be without her knowledge, we are in danger of being confused by the bare surface aspect and lose the sense in pursuit of the mere form of the

words of the statute. It is either true or not true that the intimacy existed, and her testimony that it did not exist is an affirmance of the absence of the grounds of the motive for the homicide that the evidence previously given for the State indicated as the only assignable motive. It is true that Baum might be proven guilty of murder without proof of any motive and that his reason for the homicide does not in itself render him more or less guilty; then why should proof of motive be allowed? We take it for the purpose of aiding the proof of intent and malice and of probability that he did the act unlawfully. It is more likely one would unlawfully kill the person he hated or feared than a person he neither hated nor feared. If the motive be thus connected with the act it is a relevant fact, as much so as the kind of weapon or means used in the killing. If a State's witness, after saying that defendant cut the deceased with a knife blade six inches long, should testify that the blade was but an inch long, and the State had already offered proof tending to show it was six inches long, surely he could be contradicted by his previous statement, for the intent to kill or not to kill is to be judged of, in part at least, by the nature of the weapon used.

In Rice v. State, 51 Texas Crim. Rep., 255, the term "collateral," as relating to the matter of impeachment of a witness, is defined as signifying matter not relevant to the party's case. In Red v. State, 39 Texas Crim. Rep., 414, 46 S. W. Rep., 408, this court held that where the wife of defendant testified that she saw the killing, after having stated that she did not, it was permissible to contradict her by proof of her prior negative statement. In McCray v. State, 38 Texas Crim. Rep., 609, 44 S. W. Rep., 170, it is held that prosecutrix in an assault case can not be impeached by proof from others that she was a prostitute, as that was not a fact relevant to the case, but could be asked if she was a prostitute as that related to her credit.

In Exon v. State, 33 Texas Crim. Rep., 461, 26 S. W. Rep., 1088, defendant's wife having testified before the grand jury that she caught defendant and the girl (an under-age rape case) testified on the trial, being introduced by defendant, that she had never seen them in compromising position. It was held she could be impeached by her contrary testimony before the grand jury. In Exon v. State, 33 S. W. Rep., 336, it was held that a wife, witness for husband, may be asked on cross-examination if she gave birth to a child before marriage, but not contradicted if she denied it, as the matter was collateral to the issue and went merely to her credit. In De Lucenay v. State, 68 S. W. Rep., 796, it was held not error to refuse to let defendant show by cross-examination of second woman (the charge being bigamy) that she was guilty of incest, she not having testified to any material fact for the State, the idea being that it was idle to impeach a witness who had not testified to any fact. In Brittain v. State, 85 S. W. Rep., 278, a woman charged with killing another testifying for herself, was asked on cross-examination as to her im-

proper relation with her husband before marriage, the theory of the State being that jealousy was the motive for the killing. This court held it proper. In Lankster v. State, 43 Texas Crim. Rep., 298, 72 S. W. Rep., 388, it is held that collateral matter, or such as a party could not prove to make out a case, is not subject to impeachment. In Railway Co. v. Brown, 76 S. W. Rep., 794 (civil case for death on railroad), defendant's engineer testified that when he saw deceased he thought he was on the dump. It was held proper to permit proof by other witnesses that he had stated that he thought deceased was on the bridge and would get off. In Richardson v. State, 44 Texas Crim. Rep., 211, 70 S. W. Rep., 320, it is held that character of the female in incest being immaterial, she can not be impeached by testimony of admissions of intercourse with other men. In Boatwright v. State, 42 Texas Crim. Rep., 442, 60 S. W. Rep., 760, the witness denied his statement of his reason for leaving defendant's home and assigned another reason. Held, he could not be contradicted for that his reason for leaving was immaterial, but it is said if he had testified to seeing the offense committed, or some act *tending* to *prove* it, he could be impeached. It is held in Bennett v. State, 28 Texas Crim. App., 539, 13 S. W. Rep., 1005, that a State's witness may be impeached by proof of his ill-will toward defendant and of his reckless disregard of truth. Turner v. State, 33 Texas Crim. Rep., 103, 25 S. W. Rep., 635, holds relevant to the relation of defendant with deceased, the suing out of an injunction that caused ill-will. In Herndon v. Reed, 18 Texas Crim. App., 665, it is held that a witness for the State may be impeached by proof that he sought to induce another witness to lie; and in White v. Railroad, 46 S. W., 382, it is held that a witness' statement that he got money to testify may be used to impeach him when he had denied it.

It would seem logical that when a party may impeach his own witness who testifies to the injury of his cause, he should have the same latitude so far as relates to proof of contrary statements, as though the witness were put up by the adverse party, except when he has no other evidence of the fact to be proved or no good reason to expect the witness to be favorable. If the fact be relevant in the first degree and the State has made some proof of its existence, then puts up a witness who knows whether it is true or not and who has previously sworn it was true, expecting he will so swear on the stand, then if such witness testifies the fact did not exist, the State may justly claim both surprise and injury. Had the witness not led the State to expect her to affirm the fact, the State would have rested the issue upon other evidence it had or could obtain, and if in such event this witness had been called for the defendant the State could have contradicted her by her prior statements. The real reason why a party may attack his own witness is that he turns out to be a witness of his adversary, and while the adverse party is not responsible

for the double-dealing of the witness and should be guarded against the possibility that the jury may mistake the impeaching prior statement for evidence against the defendant; the State, acting upon the reasonable belief that the witness would adhere to his prior statement, ought not to be left in the attitude of disproving by one witness what it had sought to prove by another. Therefore, it should be permitted to show that the witness by his previous statement had led the State to expect favorable testimony and to produce such previous statement so that the jurors may determine what weight ought to be given his testimony. If they, notwithstanding the statement out of court, accept the testimony of the witness, it is their prerogative. On the contrary, should they conclude the witness unworthy of credit in the particular matter, it stands as though the witness had not testified and neither party is wronged.

While the statutory words are, "when facts stated by witness are injurious to his case," it has never been understood that a witness could not injure the cause of the party calling him by deposing to a state of facts which, if true, prove a negative. If Mary's testimony were taken as true it proved a negative which defendant did not have to prove, and had no interest in proving until some evidence affirming the fact had been adduced. If proof of a negative be made it matters little whether the proof come from the State's or defendant's witness. If the affirmative fact be helpful to the State, the denial is helpful to defendant and hurtful to the State. If she had testified defendant did not use the knife on deceased, or did not utter the words attributed to him by other State's witnesses, she would have *merely denied* facts testified by other witnesses; yet if she had previously affirmed such facts, surely she could be impeached. If an answer of witness in negative form is not impeachable, why should any statement that is in substance a refutation of the State's case be impeachable? The test is not in the form of the words, but in their effect upon the case as it stands at the time, whether the witness affirm or deny the fact. A defendant may wholly defeat the case by evidence going no further than to deny the facts of the case. It is a refinement of construction destructive of the purpose of the statute to distinguish between negative and affirmative responses of the witness, holding the one without and the other within the statute. The form of the response is, after all, determined by the phrasing of the question. In whatsoever form of words the party's witness may testify of or concerning a relevant fact if *what* the witness testifies is injurious and can not be true, unless what had already been testified in behalf of the party is false, the statute applies.

The State's motion for rehearing is granted and the judgment is affirmed.

*Affirmed.*

ON MOTION FOR REHEARING.

January 4, 1911.

COBB, SPECIAL JUDGE.—We have again considered the cases cited by counsel, and remain of the opinion that the testimony complained of in bills 3, 4, 5 and 6 was, under the circumstances, admissible. The conversations between Mrs. Watson and him regarding his conduct toward Mary Watson were part and parcel of his conduct extending over a period of eight years, beginning shortly after his marriage, and ending upon the eve of the homicide. Such conversations, taken apart from the conduct, would not have been admissible.

We rest the treatment of the other questions raised in the motion upon the former opinion. The case of Skeen, 100 S. W. Rep., 770, may seem to give support to appellant's contention against the admissibility of the contradiction of Mary's denial of intimacy with appellant, but there the witness admitted making the contrary statement, and Judge Davidson says there were some circumstances of suspicion of, but no evidence to sustain the fact sought to be proved. He was not considering the distinction between a case where there is already some proof of the matter and a case where there is none. None of the other cases cited in the motion refer to this distinction. The views of the court upon this point are sustained by the Supreme Court of Minnesota in Lindquist v. Dickson, 6 L. R. A., new series, 729, and the English Court of Criminal Appeals, Dibble case, 1 Crim. App. Cas., 156, the English statute, 28-29 Vic., being in substance the same as ours.

The motion is overruled.

*Overruled.*