EARNEST KING v. THE STATE.

No. 14844.  Delivered June 8, 1932.
Reported in 51 S. W. (2d) 325.

The opinion states the case.

*Johns, McCampbell & Snyder,* of ·Corpus Christi, and *Robert W. Stayton,* of Austin, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CALHOUN, JUDGE.—The offense, murder; the punishment, two years in the penitentiary.

Appellant and deceased and all of the witnesses were negroes except the doctor and the deputy sheriff, who were not eyewitnesses. The locality of the homicide was the negro section of Kingsville on a street known as Rat Row, and it occurred about 10:30 o'clock p. m. A short while before the killing, one Iowa Edwards asked the appellant to escort her home after the church services, and he stated that he would provided she waited for him while he ate his supper (he being a brakeman and expecting to be called out on a run). After the appellant ate his supper, they proceeded in the direction of Iowa Edward's home. It seems from the evidence that the deceased, Clyde Johnson, and Iowa Edwards had been sweethearts for several years. As the appellant and the said Iowa were walking along the street, the deceased called to Iowa and the appellant remarked to her, "Clyde called you," and she replied, "That is all right, if you are going to take me home, come on." According to the state's witness, Delilah Chapman, when the deceased caught up with the appellant and the woman Iowa, they walked around the

corner and got out of sight of said witness, and, when she saw them again a few minutes afterwards, the deceased and Iowa Edwards went over to Bill Edward's, and the appellant came back to Mary Smith's home, and wanted to use her telephone and said he was going to have the outlaw arrested; that he wanted to call the sheriff, and the said Smith woman said that she did not want to have anything to do with it, that the appellant did not use the phone, but went back to Kitty Simmon's house, and at that time deceased came across the street and asked appellant what right he had meddling with his and Iowa's affairs; that the appellant said something the witness did not understand, and the deceased then said, "I see your gun, I know you have got your gun," and the appellant said, "Yes, I have got my gun, what are you going to do about it?" and deceased said, "I am going to take it," and, when he said that, the appellant shot him, and the witness ran.

According to the appellant, when the deceased first overtook the appellant and Iowa Edwards, the deceased struck said Iowa several times and made her go over to a restaurant, and deceased cursed appellant and said, "I guess you want some of it," and said, "You black s— of a b—, I will give you some." The appellant replied that he did not think the deceased was treating him right, whereupon the deceased left, and, while the appellant was standing at Kitty Simmon's house, the deceased returned and asked one of appellant's witnesses, "Where in the hell did Earnest King go?" and said, "I will go over there and see what he is waiting on," and thereupon he started across the street towards appellant. The appellant asked him not to come across the street, that he was not bothering him, but the deceased continued to come towards the appellant, and he had his hand just about where the buttons on his overalls fastened on the side, and, while he was advancing upon the appellant, he said, "I know you have got your gun and I am going to take it away from you." Appellant testified that he shot deceased because he was afraid of him, and was afraid he was armed and was afraid to take any chances. The evidence further showed that, after the shooting, the appellant rang up the sheriff and told him that he had killed the deceased and to come and get him.

It is shown by proper bill of exception that the appellant offered the witness, Mose Brooks, as a witness in his behalf. When the witness had testified that, at the time of the shooting, the deceased was standing still with his hands at his side, appellant's counsel then showed the witness a written statement, signed by the witness and sworn to by him before a notary public, which statement the witness acknowledged that he had made, and testified that the contents of said statement were he true facts in this case, whereupon the state's attorney objected to any further questions to said witness growing out of the contents of said statements, for the reason that the appellant was attempting to impeach his own witness without having laid a proper predicate. This objection was sustained by the

court. It is further shown by said bill that the appellant's counsel then advised the court of the contents of the statement sought to be used for impeachment purposes against this witness, the material part of said statement being as follows: "When Clyde, the deceased, got close to Earnest King, the appellant, Clyde said, 'I know you have your gun. If you have got it I am going to take it away from you.' He started towards Earnest King as if to harm him. He still had his hands under his overalls and when he got real close Earnest pulled out his gun and shot him."

The bill shows that appellant's counsel also advised the court that the appellant and his counsel were surprised by this testimony of the witness, as it was in direct conflict with his prior statements, and further advised the court that they had interviewed said witness shortly before he was placed on the witness stand, and were then informed that his testimony would be to the same effect as his written statement.

The sole defense of the appellant was that the deceased was advancing upon him in a threatening manner with his hands in the side of his overalls. Where a party offering a witness had been led to believe that the answers of said witness would be favorable instead of hurtful to him, he will be permitted to contradict such witness by proof of former statements made by a witness in line with what the witness was expected to testify to. The answer of the witness in this case were hurtful, in that they directly contradicted the theory and some of the circumstances testified to by appellant as to the conduct of the deceased immediately before the shooting. Appellant had the right to presume that the witness would testify what he had formerly said in his written statement and also as to his statement to appellant's counsel before he was placed upon the stand. His answers were upon a contested and very material issue, and the action of the trial court in this matter was, in our opinion, prejudicial to the rights of the appellant and presents reversible error. See White v. State (Texas Crim. App.), 62 S. W., 749; Jeter v. State, 52 Texas Crim. Rep., 212, 106 S. W., 371; Baum v. State, 60 Texas Crim. Rep., 638, 133 S. W., 271; Layton v. State, 61 Texas Crim. Rep., 507, 135 S. W., 557; Harris v. State, 67 Texas Crim. Rep., 423, 148 S. W., 1071; Perry v. State, 69 Texas Crim. Rep., 644, 155 S. W., 265.

A more or less serious question is raised by another bill of exception in this case as to the refusal of the trial court to grant appellant's motion to quash the special venire drawn in and for this cause. Inasmuch as this case will have to be reversed on another issue and the occurrence herein complained of is not likely to occur on another trial, we pretermit further discussion of said bill of exception.

We have considered the other bills of exception appearing in the record, and are of the opinion that no reversible error is presented by any of them.

For the error pointed out, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.